(No. 30627.—

EMILIE J. DOMBROW, Appellees, *vs.* ADOLPH DOMBROW *et al.*, Appellants.

*Opinion filed September 24, 1948—Rehearing denied Nov. 11, 1948.*

Aaron Soble, of Chicago, for appellants.

Gardner, Morrow, Fowler & Merrick, (Robert C. Barney, and James A. Howe, of counsel,) all of Chicago, for appellee.

Per Curiam: Appellee, Emilie J. Dombrow, filed a complaint in the circuit court of Cook County on May 28, 1947, seeking to set aside certain deeds, to recover the sum of $5400, and for an accounting for rents and profits accruing to the premises conveyed by the deeds. The defendants named in the complaint were her sons Adolph and Oscar Dombrow, their wives, and others not here concerned. After a hearing before the chancellor the trial court granted the relief as prayed. Adolph Dombrow and his wife, Grace, have appealed directly to this court for a review of that decree, a freehold being involved. The

original complaint charged that the two sons, through a fiduciary relationship, undue influence and misrepresentations made to appellee, wrongfully obtained a deed to her real property and $5400 of her cash. At the close of all the testimony, appellee filed an amended complaint which reiterated the allegations only as to defendant Adolph Dombrow, who with his wife, is the appellant here.

Emilie J. Dombrow, the appellee, was, at the time of the trial, 87 years old. Although in good physical health, she suffered from spells of forgetfulness, a condition which had existed for a number of years, including 1942. In 1930, at the death of her husband, she became the sole owner of two parcels of improved real estate located in Berwyn. One was a two-family dwelling which was leased to tenants. The other was a small cottage which appellee occupied as her home until December, 1941, at which time she moved to the home of a daughter, Lucy Sellers. The cottage, too, was then rented, and appellee collected rents from both premises until the month of May, 1947, and from that income paid taxes and insurance. In this she was assisted by her daughters Florence Jacklin and Lucy Sellers. In 1936, appellee was the owner of twenty shares of telephone stock, which she caused to be transferred to herself and her daughter Florence Jacklin as joint tenants, with right of survivorship. This stock had been purchased while Florence Jacklin was an employee of the telephone company, and while it is not shown definitely, there is some evidence that Florence had paid for a portion of the stock through salary deductions. In 1938, appellee transferred ownership of $10,000 worth of paid-up shares of building and loan stock from herself to joint ownership with her two daughters. She continued, however, to receive the income from such securities for her own use. It also appears that in 1938 or 1939 appellee's bank account, into which her rents were deposited, was converted into a joint account with the two daughters.

During the period from 1930 to December, 1941, appellee's family consisted of the two daughters named above, and two sons, Oscar and Adolph. All lived reasonably close to appellee's cottage, and Oscar lived with his mother at various intervals. Adolph was a carpenter by trade and was sometimes called upon to make repairs on appellee's houses, the latter paying for all materials. Appellee apparently maintained pleasant relations with her whole family, while her children, particularly Adolph and his sisters, seem to have been at odds, particularly since appellee's creation of the joint tenancy ownership of her stocks.

As previously stated, in December, 1941, appellee moved from her cottage and went to live with her daughter, Lucy Sellers. Within the month, Adolph filed a petition in the probate court of Cook County seeking to have his mother adjudged an incompetent, and a conservator appointed for her estate. A few days later he filed a petition for writ of *habeas corpus,* directed against Lucy Sellers and her husband, in which he alleged that appellee was being locked up and detained by them against her will. The petition for writ of *habeas corpus* was dismissed after a hearing, and a few days later the incompetency proceedings were dismissed without prejudice on Adolph's motion. In both of these proceedings Adolph was represented by his friend and attorney, John Ehardt.

Subsequent disclosures show that on May 16, 1942, shortly over a month after the dismissal of the incompetency proceedings, appellee executed a deed by which she conveyed her two parcels of real estate to her sons, Oscar and Adolph, as joint tenants. Adolph stated that his mother had visited his home one morning just prior to May 16, and expressed a desire to convey her real estate to her sons, inasmuch as she had already given her stocks to the daughters. Ehardt, too, testified that appellee's actions were voluntary. Preliminary discussions prior to the preparation and execution of the deed were

held in Adolph's home between appellee, Adolph, and attorney Ehardt, whom Adolph procured purportedly at his mother's request. After Ehardt had prepared the deed, a few days later another meeting was held at the residence of Louis Schalk, a brother of appellee who was approximately eighty years old, and appellee then executed the deed. Present were Schalk and his wife, Adolph and his wife, Ehardt, and an associate of his named Herman. Oscar Dombrow was neither present nor aware of these gatherings, nor were appellee's daughters. Two days after the execution of the deed, Ehardt had it recorded.

On July 9, 1942, appellee, accompanied by Adolph and Schalk, was driven to the bank where she maintained a safety-deposit box. It is conceded that while there she removed $5400 in cash. The parties then drove to a tavern where Oscar Dombrow was employed as a bartender. Adolph states that his mother then divided the money and gave half to himself and half to Oscar as a gift; that Oscar then gave his share to Adolph for safekeeping and asked Adolph to buy bonds for him. Oscar denied that he received such a sum of money, or that he had requested Adolph to buy bonds for him. It is agreed that, while in the tavern, appellee cashed a stock dividend check for $210 and gave each son half of it. Louis Schalk stated that he had seen appellee give her sons $105 each, but he did not at any time in his testimony admit that he had seen appellee divide and distribute the $5400. It is certain, however, that when the party left the tavern the money was in Adolph's possession. Later he purchased $2700 in government bonds payable to himself or his wife, Grace, and $2700 payable to himself or Oscar. Oscar claims to have known nothing about the bonds until a few weeks before the trial of this cause when Adolph and attorney Ehardt offered him his share, which Oscar declined, contending they belonged to appellee. It does appear though that Oscar had received and cashed one

of the bonds when he went to Adolph seeking money with which to pay for dental work.

On July 10, 1942, the day following the alleged gift of the $5400, another meeting was held at Adolph's home. At this time appellee signed a will, and a statement in which she ratified her conveyance of real estate and gift of money to Adolph and Oscar, and gave as her purpose the fact that she had previously provided for her daughters by making them a gift of her stock. Again, these documents were prepared by Ehardt who was present at their execution along with Louis Schalk, Schalk's wife, Adolph and Grace Dombrow, and a Dr. Koluvek who was especially present for the occasion to talk "to her [appellee,] about the will and about the property so that I would know that she was mentally capable of signing her own papers." The doctor had never seen appellee before that date nor after, and expressly stated that he was there at Adolph's solicitation, although the latter in his testimony first sought to make it appear that the doctor's presence at the meeting was purely coincidental.

The next event of importance occurred on January 10, 1945, on which date Oscar Dombrow executed a quitclaim deed to a third party, who in turn conveyed to Adoph and Grace Dombrow the real estate conveyed to the sons by appellee's deed of May 10, 1942. These deeds, too, were prepared by Ehardt; Oscar's was executed in his office and Ehardt's secretary was employed as the straw party of the transaction. Adolph's explanation of this transaction was that Oscar had made him a gift of the property. Oscar admitted that the signature on the deed was his, but stated that he could not remember signing it, was not aware that he had signed a deed, and did not know who was present when he signed it.

All of the events related above, were unknown to appellee's daughters Lucy Sellers and Florence Jacklin. They continued to collect rent from the two pieces of property

and deposited it in the joint bank account they had with their mother. Adolph explains that he had made an agreement with appellee at the time of the conveyance to him and Oscar, that appellee could collect the rents from the premises for her lifetime. It does not appear that his joint tenant, Oscar, was consulted in making this decision, nor was there such a reservation in appellee's deed to Adolph and Oscar. In May, 1947, Adolph finally openly asserted his ownership of the real estate and notified the tenants that future rents should be paid to him. It was at this time that the daughters first learned that appellee had divested herself of title to her real estate. When they sought to inquire of the situation from Adolph, he told them that he was the owner, and that it was none of their business. Although Oscar had held the title jointly with Adolph and had conveyed it away, he too testified that he was unaware that his mother had conveyed the premises. Adolph stated that he exercised his ownership of the property because he discovered that the rents being collected were being placed in the joint account of appellee with her daughters.

This proceeding quickly followed the disclosure. On the trial in the circuit court, the salient facts as outlined above were developed from the testimony of witnesses for both parties. Several witnesses for appellant Adolph Dombrow testified that appellee had expressed her intention of giving her real estate to her sons, both before and after the conveyance to them. An equal number, however, testified that she had often expressed the desire that her real estate be divided among all her children. The appellee, in testifying, stated the same intention to the court. However, it is apparent from the whole of her testimony that she was totally unaware of the turmoil about her and was living in the past. The trial court in its summation found that the evidence showed a scheme on the part of Adolph Dombrow to get the property of appellee; that, in carrying out

his scheme, he overreached in calling in a doctor and a lawyer, and in so doing indicated the plan he had in his mind; that the evidence clearly showed that Adolph had taken advantage of the physical condition of appellee, and imposed upon her. The court then entered a decree granting the relief as prayed in the complaint.

The chief contention of appellants, Adolph and Grace Dombrow, in here seeking a reversal of the decree, is that the finding of the trial court, and its decree, are against the clear, manifest weight of the evidence. Their theory is that the evidence shows only a gift by appellee, and that such gift was not induced by a fiduciary or confidential relationship between Adolph Dombrow and appellee. It is true, as appellant contends, that a fiduciary or confidential relationship will not be presumed from the relationship of parent and child. (*McCrillis* v. *Utterback,* 397 Ill. 550; *O'Malley* v. *Deany,* 384 Ill. 484.) However, as pointed out in *Lipscomb* v. *Allen,* 298 Ill. 537, and *Krieg* v. *Felgner,* 400 Ill. 113, "The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist? *Mayrand* v. *Mayrand,* 194 Ill. 45."

From the facts of the case before us, the chancellor found that a fiduciary relationship did exist between Adolph and his mother, and that he gained her property by an abuse of that relation. We have held many times that a chancellor who sees and hears the witnesses is in a better position to determine the facts than is this court, and we will not reverse his findings of fact unless they are palp-

ably against the weight of the evidence. (*Clark* v. *Clark,* 398 Ill. 592; *West* v. *LePage,* 381 Ill. 131.) A careful examination of the evidence and record before us leaves us in full accord with the chancellor that a fiduciary relation existed between the parties. Appellee was eighty-one years old when she executed the deed to her two sons. Her mental condition, particularly as to memory, was not the best. Whatever her capabilities, reason or purpose, by Adolph's testimony, alone, it is established that she came to him with the problem of disposing of her property. Adolph, who five months previously had attempted to have his mother declared an incompetent, would now have us believe that her subsequent actions were of her own volition and free and independent of any suggestion or influence on his part. The conversations which preceded the conveyance of the property were held in Adolph's home; the drafting and execution of the necessary documents were accomplished by Adolph's attorney; all arrangements were made by Adolph, leaving little doubt but what the appellee reposed the utmost confidence in him. Adolph and Ehardt's testimony that appellee furnished the legal description for the deed from memory is almost without credence in view of her faulty memory, which was clearly demonstrated at the trial.

When the existence of a fiduciary relationship has been established, the law presumes that any transaction between the parties, by which the dominant party has profited, is fraudulent. This presumption is not conclusive but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. The burden rests upon the dominant party to produce such evidence, and if the burden is not discharged the transaction will be set aside in equity. (*Clark* v. *Clark,* 398 Ill. 592; *McCord* v. *Roberts,* 334 Ill. 233.) The important factors in determining whether a particular transaction is fair include a showing

by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had, (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction. (*Krieg* v. *Felgner,* 400 Ill. 113; *Schueler* v. *Blomstrand,* 394 Ill. 600.) Appellant Adolph Dombrow has failed to prove that appellee had independent and competent advice before completing the conveyance of her real estate. A perusal of the record indicates to a certainty that the advice given to appellee by attorney Ehardt could certainly not be considered to have been advice which was independent of Adolph's interests. Ehardt had never represented appellee before, and it is doubtful that she had ever met Ehardt before the meeting in Adolph's home shortly before May 16, 1942, whereas it is admitted that he was Adolph's "friend and attorney." Without commenting at length on the role of the witness Schalk, who was evidently inserted in the picture to make it appear that appellee had the benefit of independent advice, we are of the opinion, from an analysis of his testimony, that he was scarcely such an informed and competent adviser as would enable the fiduciary to meet his burden of proof. Schalk was himself of an advanced age and possessed no abilities or knowledge which qualified him to be counsel to his sister, the appellee, in dealings with educated persons. In this regard it is interesting to note that Schalk had seen little of his sister in the years previous to the time in 1942 when the deed was signed and the $5400 allegedly distributed, and at the trial in 1947 could not recall having seen her since 1942. It is obvious that appellee was without independent and competent advice throughout all her dealings with Adolph. That he profited by his position, to the injury of appellee, may be seen from the facts heretofore related. For this reason, alone, without discussing the question of disclosure and adequacy of consideration, the trial court was justified

in setting aside the deeds by which appellants became the owners of appellee's real estate.

We are not unaware of the unfavorable implications which arise from Adolph Dombrow's actions in his dealings with his gullible brother Oscar, and from his arrangements to have appellee execute a will and statement of ratification, under the supervision of a doctor and witnesses of his choice. As stated by the trial court, we feel that such acts were but steps of a preconceived plan of Adolph Dombrow to acquire the property of his mother. However, in view of our finding that Adolph, as a fiduciary, failed to show that appellee had the benefit of competent and independent advice, a further discussion of the inadequacies of his position would serve only to unduly prolong this opinion.

Although it has not been assigned as a specific ground for reversal, appellant argues that no resulting trust could exist relative to the $5400. An examination of the judgment of the trial court does not reveal that a resulting trust was declared, but rather, on the basis of the general prayer for relief, the trial court granted a money judgment against appellant Adolph Dombrow for his wrongful taking and conversion of the money. We are of the opinion that the facts amply support such a finding, and that no question of a resulting trust is presented.

The last error assigned by appellants is that the trial court erred in rejecting *in toto* the testimony of attorney Ehardt. His testimony was given and is in the record now before us. However, the chancellor, in making his findings of fact, chose to ignore such testimony because Ehardt was the lawyer in all of the questioned transactions, and, in the chancellor's opinion, to a certain extent, assisted the counsel who actively conducted the trial for appellants. Counsel for appellants does not contend that this is reversible error, but requests only that we consider it and attach to it the same weight and credit as that given to

other witnesses. In chancery cases the whole record is before the court and if there is competent evidence sufficient to sustain the decree it must be affirmed; if not, then it must be reversed, and this is without regard to the views of the chancellor as to the competency of the evidence at the hearing. *Newman* v. *Youngblood,* 394 Ill. 617; *Treleaven* v. *Dixon,* 119 Ill. 548.

A review of the entire record, including the testimony of Ehardt, leads to the conclusion that there is sufficient competent evidence to support the decree of the circuit court of Cook County, and for the reasons stated that decree is affirmed.

*Decree affirmed.*