Margaret H. Holyoke, Appellant, v. Continental Illinois National Bank and Trust Company, Appellee.

Gen. No. 45,399.

Opinion filed January 30, 1952. Rehearing denied and additional opinion filed April 2, 1952. Released for publication April 2, 1952.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, for appellee; LEO F. TIERNEY, DONALD M. GRAHAM, and JOSEPH M. WEIL, all of Chicago, of counsel.

HEALY, NEWBY, CESSNA & HEALY, of Chicago, for appellant.

MR. JUSTICE FEINBERG delivered the opinion of the court.

Plaintiff appeals from the decree dismissing her complaint for want of equity, in an action for accounting against defendant.

The cause was referred to a master, who heard the evidence and made his findings of fact and recommendations that defendant account to plaintiff for certain securities held by the bank as collateral; that defendant occupied a fiduciary relation and owed a duty to the plaintiff to protect her in her right of subrogation; that plaintiff had not waived any right to subrogation; that plaintiff had no right to an accounting as to certain other securities; and that the complaint be dismissed for want of equity as to the latter securities. Exceptions filed by defendant to the findings favorable to plaintiff were sustained, and the entire complaint was dismissed for want of equity. A consideration of these findings necessitates a full statement of the facts.

The record discloses that plaintiff was born July 7, 1910, the daughter of A. Y. Gowen and Margaret Gowen. The parents were divorced when plaintiff was seven years of age. The mother was remarried and lived with her second husband in New Haven, Connecticut. She died in January 1929, in Connecticut, leaving an estate of approximately $6,000,000. She bequeathed $200,000 to plaintiff and the residue to her second husband and his son by a previous marriage. Plaintiff, with the help of her father, filed an action in the Connecticut court to contest the will. A settlement of the litigation was perfected, by which plaintiff was paid approximately $1,000,000, consisting principally of marketable securities. She was then eighteen years of age and, under the Connecticut law, was a minor. A guardian was appointed by the probate court in Connecticut.

At that time her father was president of the Alpha Portland Cement Company and was then indebted to the defendant bank in the sum of $250,000. Plaintiff, desirous of helping her father in his financial difficulty, agreed to direct her guardian to turn over to

her father upon his order certain securities in the guardianship estate, as and when they were available for distribution upon the closing of the guardianship estate.

About January 6, 1931, plaintiff, her father and Sterling B. Cramer, vice president of the defendant bank, conferred about plaintiff's desire to help her father regarding his indebtedness to the bank. Cramer testified that she wanted to turn over to the bank "as collateral" to be "sold and pay off the loan a sufficient amount of securities to take care of that"; that she was about to marry and intended to live in India with her husband; that she also indicated a desire to borrow $25,000 from the bank for her own account; that at that time the father's loan was sufficiently collateralized; that she was interested in her father being able to preserve the stock in his company, which was the main source of his income; that plaintiff and her father then discussed an arrangement for creating a trust estate by a trust indenture to be signed by plaintiff and her father.

An attorney selected by the father prepared a trust agreement, a letter of direction and a power of attorney to the bank. The letter of direction signed by plaintiff becomes important in the consideration of the contentions made by both sides. It is dated February 7, 1931, addressed to the defendant bank, and reads as follows:

"Gentlemen:

"Following the delivery to you, upon my order and for my account, by J. Dwight Dana, Guardian of my estate under appointment of Probate Court for the District of Greenwich, State of Connecticut, of all securities and any cash belonging to me and held by him as such Guardian, you are hereby authorized, empowered and directed:

"(1) To set aside, transfer, turn over and deliver to my father, Albert Y. Gowen, or upon his order, for his own personal account and in his own name, all accumulated cash received from J. Dwight Dana as Guardian aforesaid, and securities according to a list to be subscribed by my father and to be now or hereafter attached hereto and to become a part hereof, the assignment of which shall be executed by you under Power of Attorney heretofore given you, and this order and authority shall be a full release and discharge to you for all liability to me for the aforesaid cash and securities so delivered; and

"(2) To set aside, transfer, turn over and deliver to your Company in its corporate capacity, such amount of the remaining securities as may in its judgment be necessary as collateral security for any loan or loans, or other obligations owing by me, represented by my promissory notes or otherwise, to be held by your Company in accordance with the terms and conditions of, and with all the powers and rights embodied in, any note or notes, or any other obligation or undertaking of mine held by your Company; Provided, that upon the payment of said loan or loans, or any other obligations, or the satisfaction thereof from the proceeds of all or any of said securities, such securities, or the balance thereof or of the proceeds, shall be turned over, transferred and delivered to your Company as Trustee under Trust Indenture, executed by my father and myself, as Donors, dated February 7th, 1931, to be held under the terms of the trusts thereby created; and

"(3) To transfer, turn over and deliver, all remaining securities received by you from said J. Dwight Dana, as Guardian aforesaid, both before and after the payment or satisfaction of my existing indebtedness, if any, to your Company in its corporate capacity

289

as aforesaid, to your Company as Trustee under the terms of the Trust Indenture aforesaid, executed by my father and myself, dated 1931, to be added to the Trust Estate created thereby, and to be held by you as such Trustee under said Trust Indenture as fully and as effectually as if recited herein.

"Your delivery and transfer of the cash and securities aforesaid, to my said father and to your Company in its corporate capacity as collateral security as aforesaid, and of the balance of said securities to your Company as said Trustee, shall be a full acquittance and discharge of your obligation under the order whereby said cash and securities were delivered to you by J. Dwight Dana aforesaid."

Attached to this letter of direction was a list of securities to be held by the bank as collateral security for the indebtedness of the father to the bank.

Plaintiff and her father executed the trust indenture dated February 7, 1931, in which they are referred to as the donors and the defendant bank as trustee. The trust indenture recited that "The Trustee acknowledges receipt of Five Hundred Dollars ($500) from each of said Donors, and agrees to receive such additional property and estate as may be transferred and delivered to it by either of the Donors, and to hold, manage, invest and administer said Trust Estate all as herein provided, and all provisions as to the payment and distribution of the income and principal of said Trust Estate are subject to the limitations hereinafter provided." The trust instrument contained many provisions relating to the trust property and the payment of its income and principal, which we deem unnecessary to consider. Article XXI of the trust indenture provided:

"The powers and duties of the Trustee hereunder and all questions of interpretation of this instrument shall be governed by the law of the State of Illinois."

290

The power of attorney to the bank executed by plaintiff, dated February 7, 1931, gave broad powers to the bank to sell, assign or transfer any and all personal property now or hereafter belonging to plaintiff in the possession of the attorney in fact, including all bonds and securities of every nature and description.

On February 17, 1931 the signed letter of direction, power of attorney and trust indenture were delivered to Cramer. A collateral note for $250,000, with the usual provisions of power of sale of the collateral in event of default was then signed by the father and endorsed by plaintiff, guaranteeing the payment of the note and all costs, expenses and attorney's fees incurred in the collection and enforcement thereof, waiving notice of dishonor and consenting to any renewal or extension of said note. At the same time a loan of $25,000 was made to plaintiff by the bank, and a note for the amount was signed by the father and likewise endorsed by plaintiff as guarantor, the bank suggesting that method of handling the latter loan. The proceeds of this loan were credited to the father's account in the bank.

Under the Connecticut law plaintiff became of age on July 8, 1931. Between July 8 and September 16, the guardianship estate of the plaintiff was closed. All of the securities and cash in the hands of the guardian were delivered in accordance with the letter of direction executed by plaintiff on February 7, 1931. The securities received by the bank on September 16, 1931, from the guardianship estate, were taken over by the bank. Those securities which were in the list attached to the letter of direction were taken over by the bank and held as collateral security for the note of the father, and the remainder of the securities was taken over by the bank and held by it as trustee under the trust indenture. It does not appear that there was placed in the trust estate any securities or property

to be administered by the trustee except that belonging to plaintiff and received from the guardianship estate.

About September 16, 1931, the securities of plaintiff, as well as those of the father, had substantially declined in value. Those held as collateral security for the indebtedness to the bank in the sum of $275,000 were insufficient to pay in full the amount of the indebtedness. All of plaintiff's securities had declined in value from approximately $1,000,000 to $500,000. Instead of exercising the power of sale in the collateral notes, the bank elected to exercise its claimed authority in paragraph (2) in the letter of direction and, as trustee, allocated from the trust estate additional securities as further security for the notes. The allocation of these securities was reported by the bank to the father, but nowhere does it appear that any notice of such allocation from the trust estate was given to plaintiff until October 21, 1942. The market continued to decline, and on September 24, 1931, the father authorized the bank to sell the securities of plaintiff to pay the notes. The bank proceeded to sell plaintiff's securities, but not those of the father, and realized a total of $255,470.71, leaving a balance due on the notes of $19,529.29, which was paid by the father. The collateral belonging to the father held by the bank was returned to him, none of it having been used or liquidated to pay the notes. It appears that the securities of the father held by the bank, if then liquidated, would have been sufficient to satisfy the indebtedness. No report of the sale by the bank of the collateral was furnished to plaintiff by the bank until October 21, 1942, in a letter from the trust officer to plaintiff, then living in India. The bank reported to the father but not to the plaintiff, except as noted. The father in his testimony was vague and uncertain about whether he ever wrote to plaintiff of the sale of the collateral, and no letter in evidence from the father to plaintiff contains any such information.

Tersely stated, plaintiff's contentions are that the evidence clearly establishes that plaintiff loaned the securities in the list attached to the letter of direction to her father with the bank's knowledge, to be held by the bank as collateral security for the note; that the notes were the primary obligation of the father, and the plaintiff's obligation only secondary as a guarantor; that the letter of direction and the power of attorney, as well as the trust indenture, created the relationship of fiduciary between the bank and the plaintiff; that the bank's duty as such agent and fiduciary was to resort to a sale of the father's collateral security to discharge the primary obligation, and it could have realized sufficient from that collateral to satisfy the indebtedness without resort to plaintiff's securities; that in any event the bank had no right to return the securities of the father to him after the sale of plaintiff's securities; that plaintiff would have had a right of subrogation against the father's securities; that the surrender of the securities to the father was a breach of the bank's duty as fiduciary, and the bank became liable to account to the plaintiff for said securities; and, finally, that the bank had no authority under the letter of direction to use the additional securities allocated from the trust estate, except to devote it as security for any direct personal obligation of the plaintiff and not that of her secondary liability as guarantor.

Defendant contends that the evidence establishes an outright gift to the father of the securities in the list attached to the letter of direction, so that they became his personal property, and he therefore had ample authority to pledge the same as collateral for his note; that as to such collateral held by the bank, it occupied no fiduciary relation or agency to the plaintiff; that it had the right to sell all or any part of the collateral held by it in accordance with the power of sale contained in the collateral notes; that as to the additional

293

securities allocated from the trust estate to the collateral account, it had ample authority to make the allocation under paragraph (2) of the letter of direction, and had no greater duty with respect to such additional securities when they became collateral for the note than it had as to the securities in the original list; and that plaintiff's action is barred by the Statute of Limitations and by laches.

██ We agree with defendant's contention that as to the securities listed in the letter of direction and originally deposited with the bank as collateral security for the notes in question, it did not occupy any fiduciary relation to the plaintiff. The position of the plaintiff was simply that of a guarantor, and the terms of her guaranty and the power of sale contained in the notes justified the defendant, in the absence of any agreement to the contrary, to sell any or all of the collateral to discharge the notes. There was no agreement that the bank first sell the securities of the father before resorting to the collateral of plaintiff, nor any restriction against the bank returning the securities of the father, having satisfied the notes out of the sale of plaintiff's securities.

██ ██ There is, however, in our judgment, a clear line of demarcation as to the relation of the parties with respect to the securities allocated from the trust estate to the collateral account and taken by the bank as additional collateral for the notes in question. When, as trustee, it took from the trust estate for its benefit and used it as collateral to protect itself, even if it believed it had authority to do so under the terms of the letter of direction, it nevertheless had a definite duty as trustee to protect the interests of plaintiff to the fullest extent the circumstances would permit. The interests of the plaintiff and the bank were then adverse, and as trustee it could not indulge in any form of self-dealing in the trust property when the trustee

294

is to benefit therefrom. This court (First Division) in *Continental Illinois Nat. Bank & Trust Co. v. Kelley,* 333 Ill. App. 119, said:

"It is a salutary rule, long recognized, that a trustee may not engage in self-dealing in the performance of its duties as trustee, which results in loss to the trust. To relax this rule would be dangerous to the trust in too many other instances — instances where the trustee may not be in a position to make good the loss. The question of negligence or good faith does not enter into it. As was said by the Supreme Court in *Miles v. Wheeler,* 43 Ill. 123, at p. 126:

" 'It avails nothing to show that the intentions of the trustee were honest, and that there was no fraud in fact. It is one of those cases in which the law will not permit a trustee to palter with his own conscience. It shields him from all temptation by the inflexible rule that he cannot buy. The plain and sufficient reason is that the interests of the buyer and seller of the same property are necessarily antagonistic, and the only safe rule is one which absolutely forbids a trustee to occupy two positions inconsistent with each other.' " Citing *Joliet Trust & Savings Bank v. Ingalls,* 276 Ill. App. 445, 450; *Magruder v. Drury,* 235 U. S. 106.

In *Nonnast v. Northern Trust Co.,* 374 Ill. 248, 261, the court adopted with approval the frequently quoted language of Justice Cardozo in *Meinhard v. Salmon,* 249 N. Y. 458:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the *punctilio* of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbend-

ing and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. (*Wendt v. Fischer*, 243 N. Y. 439, 444.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.''

■ At the time the bank decided to sell the collateral to satisfy the notes it had the power to sell the collateral of the father, which at that time was about sufficient to satisfy the notes, and combined with the securities listed in the letter of direction was more than sufficient to satisfy the notes. It had no fiduciary duty to the father, whereas with respect to the securities allocated from the trust estate it owed to plaintiff a definite duty as fiduciary. It chose to sell all of the securities of the plaintiff, including the securities allocated from the trust estate, and none of the collateral of the father. In the exercise of its duty as fiduciary, it should have withheld the collateral of the father, against which plaintiff would have had the right of subrogation, since it was her property which was used by the bank to satisfy the notes, the primary obligation of the father. *Lochenmeyer v. Fogarty,* 112 Ill. 572; *Moore v. Topliff,* 107 Ill. 241; *Darst v. Bates,* 95 Ill. 493.

We think the master was correct in his recommendation that as to the securities allocated from the trust estate, the defendant should be held to account to the plaintiff.

■ ■ Defendant's position as to the Statute of Limitations and laches barring the instant action is without merit. This was an active trust. The rule is stated in *Chicago & E. I. R. Co. v. Hay,* 119 Ill. 493, at p. 502:

"No lapse of time is a bar to a direct trust, as between trustee and *cestui que trust.* . . . At least, time begins to run against a trust only from the time when it is openly disavowed by the trustee who insists upon an adverse right or interest which is fully and unequivocally made known to the *cestui que trust.*"

To the same effect are *Finn v. Wetmore,* 212 Ill. App. 550, and *Huffman v. Gould,* 327 Ill. App. 428.

That part of the decree dismissing the complaint for want of equity, relating to the securities listed in the letter of direction, was correct and is affirmed. That part of the decree dismissing the complaint for accounting as to the securities allocated from the trust estate is erroneous. Accordingly, the decree is reversed and the cause remanded with directions to enter a decree consistent with the views herein expressed.

*Affirmed in part; reversed in part and remanded with directions.*

KILEY, P. J. and LEWE, J., concur.

ADDITIONAL OPINION ON PETITION FOR REHEARING

Defendant, in its petition for rehearing, has challenged the correctness of the statement in our opinion that the securities held as collateral for the notes in question other than those in the list attached to the letter of direction, referred to in the main opinion, were allocated from the trust estate as additional security. It argues that there is no support in the record for this statement; that the securities held by the bank as collateral for the notes in question were allocated by them, not as trustee but as the agent of plaintiff under the power of attorney executed by her; and that these securities were never in the trust estate.

We have again carefully examined the record, and we shall point to specific evidence amply supporting our holding.

297

The trust indenture, dated February 7, 1931, which designated the defendant as trustee, was delivered to the bank and accepted by it on February 17, 1931. At the time of the acceptance of the trust, the bank became trustee of the initial payment into the trust estate from each of the donors of the trust, and by the specific language of the indenture "the trustee . . . agrees to receive such additional property and estate as may be transferred and delivered to it by either of the Donors." The letter of direction, signed by plaintiff, authorized the bank to receive from her guardian all of the cash and securities held by him as such guardian. The guardianship estate, from which these securities came to the bank, was closed shortly after plaintiff became of age on July 8, 1931.

Cramer, a witness for defendant, the officer of the bank who initially handled the transaction, testified that the bank received the securities in question from the guardian in August 1931. They sent one of the men from the trust department to get the securities from him and bring them back. Cramer further testified, "All of the securities that were turned over to the bank by Dana [meaning the guardian] were in the trust department, then the trust department turned over this list to us. I would say the trust department first turned over this list to me very soon after they were received by the trust department, almost immediately. I would think some time in August, 1931, that is the best estimate. . . . I stated that around September 16th additional securities were turned over by the trust department to me and when I got those I added them to the other securities as collateral. *But up to that time the second list of securities had not been turned over to me by the trust department.*" (Italics ours.) At another point in his testimony, this witness, referring to his conversation with the father of plaintiff on September 16th, stated, "The securities which were listed in the letter of direction and which

at the time of delivery was ample to pay off the loan had we sold it that day. Mr. Gowen and I debated a long time. We did not sell that day. On the 16th, he came in and we went over this list and found it was short. . . . We selected additional securities to bring the value up to $275,000.00 and decided we would sell immediately or in the very near future. When I say 'securities in addition' I mean in addition to the original items put up. . . . those are the original securities. . . . That list was increased on the 16th by the selection of additional securities.''

The witness Scanlon, employed by the bank, in his testimony clearly made reference to the collateral department and the trust department as separate departments.

 We cannot see how upon this record, and in the face of the testimony of Cramer, we can come to any other conclusion but that the securities listed in the letter of direction were taken over by the bank in its collateral account, and the rest of the securities turned over by the guardian to the bank's messenger were deposited in the trust department and were held by the bank as trustee under the trust indenture. It was not until September 16th that the additional securities for which the accounting is directed were delivered to Cramer as additional collateral for the notes. No exhibit of the bank introduced in evidence discloses a specific date of allocation of these additional securities. The bank cannot, upon this record, justify its contention that these securities which were sold to satisfy the notes were never in the trust estate but were taken by the bank and allocated to the collateral account at the time it received them from the guardian. It had the burden of clearly proving that fact, which neither the exhibits introduced in evidence nor the testimony of its witnesses establishes.

It will be remembered that at the time it received these securities from the guardian, the bank occupied

three capacities: (1) it was a creditor of plaintiff; (2) it had the power of attorney from plaintiff to receive the securities from the guardian and to cause proper transfers of them to be made, and was thus acting as attorney in fact; and (3) it was trustee for the plaintiff under the trust indenture.

. A trustee occupying three such positions, when called upon to account, has the burden of establishing by definite proof the capacity in which it handled these securities, its authority for so acting, and that it did not violate its definite duty as trustee. As trustee it had a definite duty to the plaintiff to receive under the terms of the trust indenture the property turned over to it by the guardian, and it is liable as trustee to protect plaintiff's property delivered to it.

Granting that the bank was permitted under the letter of direction to segregate the securities on the list attached to the letter and not place them in the trust, certainly as to the balance of securities turned over by the guardian to the bank the conclusion is inevitable that it held them as trustee. It could not allocate securities as collateral under paragraph (2) of the letter of direction unless, "in its judgment," it was necessary to set aside, transfer and turn over to the bank in its corporate capacity any of the securities as further collateral. The necessity for such additional collateral to the loan did not occur in the judgment of the bank until September 16th, as testified to by Cramer, and that is when the allocation of the additional securities was made. Between August 1931, and September 16th, the bank as trustee was in duty bound to receive and protect these securities.

 As early as *Russell v. Peyton,* 4 Ill. App. 473, 478, the rule was stated by this court and so far as we have been able to observe remains unchanged. It was there said:

"Among the ordinary duties of the trustee of an active trust, however such trust may arise, is included that of securing the possession of the trust property, and protecting and preserving the same from loss and injury. 1 Perry on Trusts, §§ 344, 448. This, at least, the defendants were bound to do."

We adhere to the conclusion reached in our opinion, and the petition for rehearing is denied.

KILEY, P. J. and LEWE, J., concur.