Bertha Gostomske (since deceased), Elsa Raschke, Executrix of the Estate of Bertha Gostomske, Plaintiff-Appellee, v. Herbert P. Sommerfield (since deceased), Helene Sommerfield, Administrator of the Estate of Herbert P. Sommerfield, deceased, Max Sommerfield and Bertha Sommerfield, his wife, Defendants-Appellants.

Gen. No. 47,078.

First District, Second Division.
November 26, 1957.
Rehearing denied January 14, 1958.
Released for publication January 14, 1958.

Edward T. Howe, of Chicago (Jerome H. Burns, of counsel) for appellants.

William S. Jacob and John R. Hackett, of Chicago, for appellee.

JUSTICE LEWE delivered the opinion of the court.

This action, originally brought by Bertha Gostomske, since deceased, is to set aside certain conveyances to defendant Herbert P. Sommerfield, her son-in-law, of two buildings. Upon the death of plaintiff, Elsa Raschke, executrix, was substituted as plaintiff. Issue having been joined by defendants, the cause was referred to a master to hear the evidence and report his conclusions. The master filed his report, finding the issues for plaintiff and recommending a decree in her favor. Defendants' exceptions to the master's report were overruled, and a decree in accordance with the master's report was entered. Defendants appeal from the decree.

It is undisputed that prior to the death of August Gostomske in 1929, he and his wife Bertha, the original plaintiff, had held title, as joint tenants, to the properties described as 828 Waveland Avenue and 1301 Cornelia Avenue in Chicago, containing 3 and 12 apartments respectively. Defendant Herbert P. Sommer-

field and plaintiff's daughter Erna were married in 1924 and lived with Bertha at 828 Waveland Avenue for twenty years, without paying any rent. During that period and until 1943, Herbert and Erna took over the management, care and control of the buildings. In 1943, due to Erna's poor health, she no longer participated in the management of the buildings, and Herbert alone assumed control and management. Since 1924, Bertha reposed great trust and confidence in Herbert, and it is admitted by defendants that Herbert occupied a confidential and fiduciary relationship toward Bertha. In 1930 Bertha conveyed the properties in question to her nominee, Edward Molloy, who in turn reconveyed title to Bertha and her daughter Erna in joint tenancy.

On January 25, 1944, Herbert and Erna brought Bertha who was then 72 years of age, to the office of attorney Kelly, whom Bertha knew. This was by previous arrangement between Herbert and Erna with attorney Kelly. Kelly testified that he prepared six or seven alternative deeds under the specific directions of Herbert and Erna. Kelly also testified that Bertha was just a housewife, not acquainted with financial matters, and did not think she had any knowledge of conveyances. His purpose was "to explain to her and indicate to her that somebody had to hold title, she would have to have confidence in someone."

There is some dispute as to whether Bertha signed the deed in Kelly's office or at home. Bertha was a witness in her own behalf before the master and testified:

"I think I put the signature on at home. It got late in Mr. Kelly's office and I wouldn't give my buildings away. Mr. Sommerfield asked me to sign the deed. When he asked me to sign he said 'Mother, you are still the owner.' He didn't read the deed or explain it to me. He didn't give me any money or anything of value. I trusted him at this time. He didn't have any-

480

thing and I thought he would do the right thing to me. He always said, 'I do the right thing.' "

One of the alternative deeds prepared by Kelly was a deed identified in the record as plaintiff's exhibit 4, from Kelly to Erna Sommerfield, Herbert P. Sommerfield and Bertha Gostomske, dated January 25, 1944, which was not recorded. There appears no satisfactory explanation in the record as to the reason for this latter deed nor the reason for not recording.

There is testimony in the record that this deed (exhibit 4 after it was executed, was placed in an envelope, identified in the record as plaintiff's exhibit 2, and Herbert said, "Here, Mother, you are still the owner." Herbert, in his testimony denied that he made such a statement, and claimed he could not remember whether he gave the envelope to Bertha, but admitted that the legend, "Deed Kelly to B. G., E. S. and H. P. S.," on the envelope was in his handwriting. The letters "B. G." on the envelope admittedly refer to Bertha Gostomske. This evidence tends strongly to support plaintiff's claim that Bertha never intended to part with her title when she executed the deed to Herbert.

This deed had been prepared in advance of her visit to the attorney's office. Bertha executed the deed conveying the property in question to Herbert. He and Erna then executed a deed to Kelly, as trustee, who in turn reconveyed to Herbert and Erna, as joint tenants. The essential consideration claimed by Herbert for the acquisition of the title to the properties was an alleged oral agreement made with Bertha, by which Herbert undertook to support her for the balance of her life. Herbert and Erna convinced her that by thus conveying the property to Herbert, she would be secure for the rest of her life in the way of support and a place to live.

It clearly appears that whatever little support money Herbert gave Bertha after the conveyance was out of

the rents collected from the properties. The record does not establish that Herbert had any property or estate of his own, prior to the conveyance in question, out of which he could support Bertha. The established fact is that Herbert and Erna were the beneficiaries of Bertha's bounty, by living with Bertha for 20 years without paying rent.

Erna died April 12, 1944. Proceeds of two insurance policies on the life of Erna, payable to Bertha, totalling $5,306.01, were deposited by Herbert in an account he opened in his name and that of Bertha with the right of survivorship, although he had no interest in the policies, since they were payable to Bertha. Herbert continued to live with Bertha, without paying any rent, until 1949, when he married his present wife, Helene H. Sommerfield. Herbert died December 20, 1952, and his widow Helene was made a party defendant as administratrix of his estate. The heirs of Herbert were also made defendants. Bertha died on August 30, 1953. Thus Herbert and Bertha died during the pendency of the suit.

Defendants cannot rely upon the alleged agreement of Herbert to support Bertha for the rest of her life as a consideration for the deeds, because the record does not establish performance by Herbert of the alleged agreement. Herbert died before Bertha and, concededly, Herbert could not perform during that interval. There is no evidence that upon Herbert's death his heirs or personal representative tendered any support to Bertha.

█ Furthermore, the alleged agreement is too vague and indefinite as to the nature of the support or the place where Bertha was to live in the future. It was held in LeBlanc v. Atkins, 387 Ill. 360, that an oral contract for support, similar to the one claimed by Herbert, is too vague and indefinite to constitute a valid agreement for support and maintenance. It was there said:

"The nature of plaintiff's support, the place where the home was to be, whether on this property or another, in this state or a foreign state, are important elements in a contract of this character."

What was there stated is clearly applicable to the facts in the instant case.

Defendants contend that the evidence establishes that Bertha knew she was signing a deed; that it was her free and voluntary act; that there was a valid consideration for the deed; and that Herbert acted in good faith. The record does not support defendant's contention.

■ We are convinced that Bertha did not intend to part with her title to the property in question and give Herbert complete and exclusive title thereto. We think the evidence clearly shows that Bertha was overreached in this transaction by Herbert, her fiduciary. The record presents a clear picture of a fiduciary engaging in self-dealing with the subject matter of his trust for his benefit.

■ We said in Fischer v. Slayton & Co., Inc., 10 Ill.App.2d 167, 172, quoting from Holyoke v. Continental Illinois National Bank & Trust Co., 346 Ill. App. 284, 295:

"It is a salutary rule, long recognized, that a trustee may not engage in self-dealing in the performance of its duties as trustee, which results in loss to trust. To relax this rule would be dangerous to the trust in too many other instances—instances where the trustee may not be in a position to make good the loss. The question of negligence or good faith does not enter into it."

Our Supreme Court in Nonnast v. Northern Trust Co., 374 Ill. 248, 261, quoted with approval the language of Justice Cardozo in Meinhard v. Salmon, 249 N. Y. 458:

" 'Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden

to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. (Wendt v. Fischer, 243 N. Y. 439, 444.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.' "

In Barnes v. Brown, et al., 80 N. Y. 527, it was held that a person occupying a fiduciary relationship toward a principal is "under the same disability that attaches to all trustees in dealing with trust property and in transacting the business pertaining to the trust. He could not act as trustee and for himself at the same time. . . . It is against *public policy* to allow persons occupying fiduciary relations to be placed in such positions as that there will be a constant danger of a betrayal of trust by vigorous operations of selfish motives." (Italics ours.)

██ When the existence of a fiduciary relationship has been established, the law presumes that any transaction between the parties by which the dominant party has profited is fraudulent, and the burden is upon him to overcome the presumption. Ambrosius v. Katz, 2 Ill.2d 173, 181; Sawyer v. Creighton, 403 Ill. 364, 370; Dombrow v. Dombrow, 401 Ill. 324, 332.

Finally, defendants urge that by the deed from Molloy to Bertha and Erna, in joint tenancy and not as tenants in common, dated May 21, 1930, vested in Erna one-half interest in the properties in question, and that, therefore, the decree setting aside the deeds and

484

declaring the title in Bertha at the time of her death is too broad, and deprives Herbert or his heirs of the half interest of Erna as a joint tenant. There is no merit in this contention, since all of the deeds set aside by the decree were prepared and executed at the same time and were part of one plan. No interest of an innocent purchaser is involved in this proceeding. If the deed from Bertha to Herbert, her fiduciary, is invalid for the reasons already stated, then the other deeds executed at the same time have no legal efficacy and fall with the deed from Bertha to Herbert. It naturally follows that the deed thus remaining and not set aside by the decree is the one from Molloy to Bertha and Erna in joint tenancy. Erna having died before Bertha, Bertha acquired Erna's half interest by survivorship. In fact it appears clearly from the record that such was the intention of Bertha when the deed to Molloy was executed. She testified before the Master:

"My daughter did not give me any consideration or anything of value for the transfer of the property in joint tenancy. Joint tenancy means that in case I died she would get the property."

We should not disturb the findings of the master, who heard the evidence, and the decree which approved his findings, unless we are convinced they are against the manifest weight of the evidence. Allendorf v. Daily, 6 Ill.2d 577, 586. We think the evidence amply supports the master's findings and the decree. Accordingly, the decree is affirmed.

Affirmed.

KILEY, P. J. and FEINBERG, J., concur.