*In re* ESTATE OF RAYMOND MARKS, Deceased (Carol Marks Jacobsohn, Petitioner-Appellant, v. Jerrold Marks *et al.*, Respondents-Appellees).

Second District   No. 2—90—0351

Opinion filed April 5, 1991.

54

James T. Malysiak and Thaddeus S. Gauza, both of Freeman, Freeman & Salzman, P.C., of Chicago (Lee A. Freeman, Sr., of counsel), for appellant.

Barry S. Rosen, Joel S. Shapiro, and G. Todd Jackson, all of Sachnoff, Weaver & Rubenstein, Ltd., of Chicago (Lowell E. Sachnoff, of counsel), for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Carol Marks Jacobsohn (Carol), the widow of Raymond J. Marks (decedent), brought this action against Jerrold (Jerrold) and Louis (Louis) Marks, two natural sons of the decedent and Carol.

The decedent died on May 17, 1982, and his will was admitted to probate on June 11, 1982, in proceedings filed in Lake County. The will bequeathed 75% of his estate to Carol and the remainder in equal shares to Jerrold and Louis. The decedent's will designated Carol and their two sons, Jerrold and Louis, as co-executors of the estate. On April 25, 1989, Carol filed a motion requesting the court to protect her interest in the estate alleging that the estate had been managed solely by Jerrold and Louis and that they undertook substantial transactions involving estate assets without court authority or approval. Pursuant to this motion, Judge McKoski entered an order on April 25, 1989, requiring unanimous approval of the three co-executors or the court's approval of any transaction involving estate assets.

On December 4, 1989, after extensive discovery, Carol filed a two-count complaint against Jerrold and Louis. Count I sought construction of the decedent's will on the theory that it was ambiguous in certain respects; count II alleged that Jerrold and Louis, as co-executors, had violated their fiduciary duties to Carol and sought the protection of the court of Carol's interest in the assets of the estate. Louis and Jerrold filed a motion for a summary judgment as to count I of the complaint, and the trial court granted this motion. The case proceeded to a three-week trial on count II. At the trial's conclusion, the court entered final orders on March 4, 1990, adopting previous orders bearing dates of January 24, 1990, and February 9, 1990, which essentially denied the relief sought by Carol in count II. The court further held that Carol intended to donate as a gift to Jerrold and Louis the balance between the marital deduction and the amounts Carol received as estate income. In essence, the court held that Jerrold and Louis had not violated their fiduciary duties as dominant executors of the estate.

Due to the voluminous testimony and documentary evidence presented at trial, it is necessary to review the business background of the decedent, Jerrold and Louis prior to decedent's death and the relationship of Carol and the activity of the two sons from the decedent's death in 1982 up to the time the present litigation was begun.

Beginning in the 1950's, decedent, his brother, Jerome Marks, and his brother-in-law, Martin Rosenfield, along with a number of minority investors, began establishing a chain of movie theaters commonly known as M & R Theaters, which eventually became one of the largest theater chains in the Chicago area. Decedent, who was principal officer and prime mover of the business, and his partners also owned interests in a number of other business organizations, such as bowling alleys and car washes. After decedent's brother, Jerome Marks, died, decedent and Martin Rosenfield distributed the stock of the various M & R corporations to reflect a 50% interest for each of them. Prior to decedent's death in 1982, he made small annual gifts of M & R stock to Carol, Jerrold, and Louis.

In 1981, decedent engaged attorney Harold Burnstein to draft his will, which was executed on January 8, 1982. The will provided in pertinent part:

"*Article 1.01* The expenses of \*\*\* the administration of my estate shall be paid out of the principal of my residuary estate \*\*\*.

\* \* \*

*Article 1.02* All inheritance, estate and succession taxes \*\*\* payable by reason of my death \*\*\* shall be paid out of and be charged generally against the principal of my residuary estate \*\*\*.

\* \* \*

*Articles 4.01(a) and (b)*:

(a) *Gift to Beloved Wife.* If my beloved wife survives me for ninety (90) days, I give to her the 'Marital Bequest' in a pecuniary amount equal to three-fourths (3⁄4) the value of my adjusted gross estate as finally determined for federal estate tax purposes less the aggregate value of all interests in property which pass or have passed from me to my beloved wife, except under this Article Four, and which otherwise qualify for a marital deduction. The final determinations made in the proceeding to fix the liability of my estate for federal estate tax purposes shall be conclusive as to the value of the Marital Bequest. Each item of property allocated in kind to the Marital Bequest shall be valued for purposes of satisfying the above described pecu-

niary amount at the date of distribution to my beloved wife. The Executor's decision as to the property to be distributed to my beloved wife shall be final and conclusive and binding upon all beneficiaries, provided only that the Executor may not allocate to the Marital Bequest any property with respect to which no marital deduction would be allowed if such property were distributed to my beloved wife or, except to the extent other available assets are inadequate, property which constitutes the right to income in respect of a decedent under Section 691 of the Code or successor provisions. The marital deduction referred to herein is the deduction allowed in determining the federal estate tax for property passing to a surviving spouse under Section 2056 of the Code or successor provisions. The Marital Bequest shall be entitled to the same share of the income of my estate as if the bequest were made in trust.

(b) *Residue.* The balance of my residuary estate, or all thereof if my beloved wife does not survive me for ninety (90) days shall be distributed to my descendants, *per stirpes.*"

The will contained no waiver clause with respect to a possible conflict of interest between the co-executors. The practical effect of the will was that Jerrold and Louis were each beneficiaries of 12½% of decedent's estate while Carol was given 75%.

Decedent died suddenly on May 17, 1982. His will was admitted to probate and Jerrold, Louis, and Carol were appointed co-executors on June 11, 1982; their oaths of office were filed on June 21, 1982. On March 7, 1983, an inventory of the estate was filed, listing 49 items, including stock in 24 corporations, the bulk of which comprised the business known as M & R theaters. Further, the inventory listed bonds and notes and partnership interests in other entities. The trial court approved additional executor's bonds on March 18, 1983, and the record also included a State of Illinois inheritance tax return filed on March 15, 1983. The next entry in the record is an attorney's appearance on behalf of Carol, which was filed on April 25, 1989, together with Carol's motion requesting the court to protect her interest in decedent's estate.

Following decedent's death, Jerrold and Louis, who had been employed by M & R since 1975 and 1971, respectively, took on increased responsibilities with that business. Jerrold's duties related to managing the financial structure of the various entities, and Louis's responsibilities related to everyday management and operation of the theaters. Under Jerrold's guidance during the years 1983 to 1987, M & R expanded the number of screens at established theaters, acquired the

Fine Arts and Hyde Park theaters in Chicago and the Evanston Theater, and established the Webster Place and River Run cinema complexes. At the time of his death, decedent held an interest of approximately 35% in those theaters and properties owned by M & R. No equity interests in the movie theaters acquired or built after decedent's death were transferred to the estate. Jerrold and Louis held between them a 50% interest in the Hyde Park, River Run, Webster Place, and Evanston theaters. They held a 40% interest in the Fine Arts Theater; Carol owned a 10% interest in this theater. The Rosenfield family held the remaining 50% ownership in same. The evidence was contradictory as to whether Carol had any interest in the Hyde Park and/or Evanston theaters. Funding of the expansion and acquisition of the foregoing theaters was accomplished via loans from those M & R businesses in which the estate held a 35% interest at decedent's death or the use of the assets of said businesses as security for bank loans.

In the years immediately following decedent's death, the estate, primarily through its attorney, Harold Burnstein, negotiated with the Internal Revenue Service as to the value of the estate's assets, the majority of which was the stock of numerous closely held corporations that were listed in the inventory. In October 1985, the estate received an IRS closing letter, which valued the estate as of decedent's death at $4,295,600. After deducting certain assets, which in the interim had been transferred to Carol, the IRS determined that the marital bequest totaled $2,823,269. Late in 1985, Carol married Howard G. Jacobsohn, a certified public accountant.

The evidence further indicated that Carol, Louis, and Jerrold met regularly with members of the Rosenfield family to discuss informally the business of the M & R theaters. From these meetings, Carol gained a general understanding of the M & R theaters, but she did not receive any of M & R's annual reports or other pertinent financial data regarding the business. Further, Jerrold and Louis were officers or directors of the M & R corporations, while Carol had no official business responsibilities in relationship thereto. Her principal activities involved philanthropic organizations and artistic pursuits.

During 1986, the principals of M & R, including Jerrold and Louis, decided to sell the business. They initially retained the First Bank of Boston to solicit offers. They eventually negotiated with two business entities, American Multi-Cinema, one of the country's largest chains of movie theaters, and Redstone National Amusement. Said negotiations did not result in offers that were acceptable to M & R's management. During 1986 and 1987, Cineplex Odeon was aggres-

sively purchasing theater chains in the Chicago area and was preparing to build a number of new theaters at suburban and Chicago locations. A number of articles in Variety, a publication pertaining to the entertainment industry, were admitted into evidence. These described the "merger mania" taking place in the movie theater industry and the fact that box office profits were up substantially in 1986 and 1987. Also, at this time, the Justice Department was loosening antitrust restrictions which had previously prohibited movie producers and movie distributors from owning movie theaters. This change in policy had the effect of increasing demand for existing movie theater chains, such as M & R.

The estate was not closed in 1986, purportedly due to tax purposes. Both Jerrold and Louis testified that up to and through 1986 each assumed that Carol would receive 75% of the shares in the estate held in the various M & R theatres.

Early in 1987, attorney Lance Rodgers, a long-time friend of Louis, who had analyzed the prior offers to purchase M & R, was asked by Jerrold and Louis to analyze decedent's will. Rodgers told them that decedent's will set a certain finite amount to be provided as a bequest to the surviving spouse and that said amount referred to the Federal estate tax values as finally determined. Rodgers further told them that the marital bequest was $2,823,269.

On March 9, 1987, Jerrold, Louis, Carol and Lance Rodgers met with Harold Burnstein, the estate's attorney, at the latter's office. The meeting's purpose was to discuss the manner by which the marital bequest would be funded. The testimony as to what occurred at this meeting presents contradictory viewpoints. Carol testified that, from this meeting, it was her understanding that the marital bequest had to be made in cash. All other participants testified that various scenarios were presented as to how the marital bequest should be funded, including mixtures of stock and cash, as well as cash only.

In September 1987, Jerrold sent Carol a probate court form entitled "Receipt and Approved of Fund Report of Independent Representative" which, in effect, acknowledged that she had received her interest in the estate; Carol signed and returned this form. At the time of signing the document, no final account and report for the estate had been prepared or submitted. Further, at the time of trial, no such final account and report had been submitted, but Carol acknowledged receipt of her marital bequest in the form of cash.

In February 1988, Jerrold and Louis were informed that the Loews' theater chain was interested in buying M & R. The first meeting with Loews' representatives occurred in March 1988. The sales

agreement reached with Loews in May 1988 assigned a value of $63,397,000 to the M & R theaters and contained $3,103,000 for a covenant not to compete, with the offer totaling $67,500,000. The allocations of asset values were made solely by Loews without negotiation. Also, under the agreement, Loews was to pay $1,600,000 in land rental annually for 20 years, with two 10-year renewal options, which would be increased over time to reflect inflation. Further, Loews agreed first to employ the four principals of M & R (including Jerrold and Louis) for an aggregate sum of $400,000 a year; second, Loews agreed to provide for the four principals, four incentive bonuses of 10% of any excess gross revenues over $5 million a year; and third, Loews agreed to give them options to buy up to 150,000 shares of Columbia Pictures stock. (Columbia Pictures owned Tri-Star Pictures which, in turn, owned the Loews' theater chain.) These financial terms were reached in June 1988. From the Loews deal, including purchase of the theaters and rental payments, Jerrold and Louis received approximately $20 million each. Carol's share, based on her personal stock holdings in M & R (acquired prior to decedent's death) was approximately $5 million. (This figure does not take into account the money paid to Carol as the marital bequest.)

On appeal, Carol argues that (1) the trial court erred in granting partial summary judgment as to count I of the complaint which sought construction of purported ambiguities of decedent's will; (2) the trial court erred in finding that the marital bequest was fully funded; and (3) the trial court erred in finding that Jerrold and Louis had not violated their fiduciary duties.

Carol filed her verified complaint on August 18, 1989. Count I asserted that certain provisions of decedent's will were ambiguous and required extrinsic evidence for proper construction. In count II, plaintiff, Carol, alleged that Jerrold and Louis had violated well established fiduciary duties owed to her as decedent's spouse and principal beneficiary under his will.

### ORDERS INVOLVED IN THIS APPEAL.

Jerrold and Louis moved for partial summary judgment as to count I, arguing that there was no genuine issue of material fact as to any ambiguity of the subject will. Said motion was granted on December 4, 1989, during the first week of the bench trial.

In an order dated January 24, 1990, but entered on March 2, 1990, the trial court entered judgment in favor of Jerrold and Louis on count II of plaintiff's complaint. This order held further that Carol was entitled to 10% of the Hyde Park Theaters, Inc.; that Carol was

entitled to the appropriate share of the estate's income received from February 1, 1987, to August 5, 1990, subject to review by the court; this order then directed the parties to provide the trial court with information as to whether Carol had received her full marital bequest.

The order dated February 9, 1990, and entered on March 2, 1990: (1) reversed the trial court's prior decision that Carol was entitled to a 10% interest in the Hyde Park theaters; (2) deferred ruling on Carol's donative intent to give Jerrold and Louis the sum of $630,000 rather than $574,358, as held by the January 24, 1990, order; and (3) directed Carol to provide evidence, if any, that $630,000 in estate income paid to her prior to January 31, 1987, was transferred back to the estate.

On March 2, 1990, the trial court entered two orders, one denying Carol's motion to order distribution, and the second adopting the orders dated January 24, 1990, and February 2, 1990, as reflecting the court's oral rulings on all remaining matters on those dates. The second order entered on March 2, 1990, stated that it was final and appealable pursuant to Supreme Court Rule 304 (134 Ill. 2d R. 304) and there was no reason to delay appeal. In view of the complexity of this proceeding, we will treat the orders entered on March 2, 1990, as final and appealable pursuant to the notice of appeal.

First, Carol argues that the trial court erred in granting Jerrold and Louis' motion for partial summary judgment as to count I of her verified complaint.

Summary judgment is a drastic and extraordinary remedy, and it must be granted only when the movant's right to judgment as a matter of law is absolutely clear and free from doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229.) Summary judgment should be granted by the trial court only when it is satisfied that the pleadings, affidavits and other evidence present no genuine issue of material fact. (*Knief v. Sotos* (1989), 181 Ill. App. 3d 959.) A trial court must construe the record before it most strictly against the movant; conversely, the court must view the record in a light most favorable to the nonmoving party. (*Knief*, 181 Ill. App. 3d at 963.) However, summary judgment is an expeditious method of disposing of lawsuits and should be allowed only when the right of the moving party is free from doubt. (*Kelman v. University of Chicago* (1988), 166 Ill. App. 3d 137.) A reviewing court's task is to determine whether the trial court correctly concluded that there were no genuine issues of material fact, and, if so, whether judgment for the moving party was correct as a matter of law. *International Amphitheatre Co. v. Vanguard Underwriters Insurance Co.* (1988), 177 Ill. App. 3d 555.

Carol argues that the subject will is ambiguous, namely, it fails to set any time for distribution of the marital bequest. She points out that in Burnstein's deposition testimony, he stated that he drafted the will and that decedent instructed him to draw up a document leaving "75% of his property" to Carol. It is well established that statements made by the testator, either before or after the making of a will, are not admissible to prove what was intended by the written will itself. *Merchant's National Bank v. Weinold* (1959), 22 Ill. App. 2d 219, 228.

Further, Carol asserts that defendants' delay in funding the marital bequest should be construed as extrinsic evidence admissible to assist in construing the will. But as Jerrold and Louis contend, this alleged delay actually relates to the issue of whether they violated a fiduciary duty rather than one of will construction.

Accordingly, we find that the trial court properly held that the decedent's will was not ambiguous and that the terms of the will may be construed in accordance with the ordinary and usual meaning of the terms therein.

We next address Carol's contention that Jerrold and Louis breached their fiduciary duties as dominant executors of the estate. Prior to so doing, we make a number of observations. We must first note that, in this most complex estate, the probate court was minimally involved. The record gives no indication that the executors ever sought an order for independent administration of the estate. There is no evidence that the estate's representatives appeared before the court on a regular basis during the estate's pendency. As a result, the probate court had no input in regard to the various actions taken by Jerrold and Louis in relationship to the estate and its assets. For example, the probate court's approval or advice was never sought as to the propriety of M & R's making loans for purposes of acquiring theaters from established corporations in which the estate held a substantial interest. Indeed, Jerrold and Louis testified that seeking such guidance never even crossed their minds. Had the estate's representatives, specifically Jerrold and Louis and attorney Burnstein, sought the court's guidance on a regular basis, much of the litigation presently before us may well have been prevented.

Next, we note our agreement with the trial court's view that Jerrold and Louis were dominant executors of the estate. There is no question that their close involvement with M & R and the business world in general and their far superior knowledge of all pertinent transactions qualified them as dominant executors. Of the two, it appears that Jerrold was most involved with the financial dealings of

M & R and the most cognizant of those transactions which affected the estate.

Further, we address an issue that carried substantial weight in the trial court's judgment. At the hearing wherein the trial court made its finding of facts and conclusion of law, the subject of Carol's credibility arose. The court below stated that aspects of her testimony were "somewhat disconcerting," particularly regarding "her lack of specific recall on points seemingly favorable to Jerrold and Louis and her specific denials of facts later determined by otherwise independent witnesses." Conversely, the court found the testimony of Jerrold and Louis to be credible.

While we do not argue with the trial court's determination as to some credibility problems in Carol's testimony, we do find that the bulk of her testimony was believable. The thrust of her testimony was that she relied heavily on her sons' judgment as to the details of the various businesses in which the estate was involved and that, from the time of decedent's death until the Loews' buyout, she did not take an active part or have extensive knowledge of the inner workings of the M & R business.

We also note that while the trial court found that the testimony of Jerrold and Louis was credible, it is clear that they never ascertained or received advice as to their duties and obligations to their mother in respect to seeing that she received competent and well-informed counsel from an independent source. We set forth several examples which clearly demonstrate that Jerrold and Louis did not realize or understand their duties in the position they occupied.

Jerrold testified that he was directly involved in the process of valuing the estate's assets for the Federal estate tax return. He further testified that he attempted to obtain the lowest valuations possible for tax purposes. During that three-year period, it *never* occurred to him that, by lowering the assets' valuation, the amount which Carol, the principal beneficiary, received from the estate would be proportionally reduced. Further, Louis testified that he was present at the critical March 9, 1987, meeting. Louis further stated that at the meeting he had upbraided Harold Burnstein, the estate's attorney, for making the valuation of the estate's assets similar to the values that Redstone National Amusement company had offered for M & R's theaters. (Redstone had initially offered $46 million for M & R.) He made this statement to Burnstein despite the fact that it was common knowledge that, under the Redstone bid, the estate's shares in M & R were worth well over twice the amount they were valued by the IRS.

Specifically, regarding the alleged breach of fiduciary duty, Carol argues that Jerrold and Louis wrongfully delayed funding of the marital bequest for their intended advantage; that Jerrold and Louis caused plaintiff to acquiesce to the funding of the marital bequest with cash only; that the marital bequest was not fully funded; and that Jerrold and Louis acquired properties in their individual names with the improper use of estate funds and credit.

■■■ The standards set forth in *Dombrow v. Dombrow* (1948), 401 Ill. 324, properly serve as the basis for this court's determination as to whether Jerrold or Louis violated their fiduciary duties as executors of decedent's estate. The *Dombrow* court stated:

"When the existence of a fiduciary relationship has been established, the law presumes that any transaction between the parties, by which the dominant party has profited, is fraudulent. This presumption is not conclusive but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. The burden rests upon the dominant party to produce such evidence, and if the burden is not discharged the transaction will be set aside in equity. [Citations.] The important factors in determining whether a particular transaction is fair include a showing by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had, (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction." (*Dombrow*, 401 Ill. at 332-33.)

Moreover, the trial court's findings of fact will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Coduti v. Hellwig* (1984), 127 Ill. App. 3d 279, 293.

After closely reviewing the voluminous record, we conclude that the pivotal issue before us is whether Carol had competent and independent advice throughout the pendency of the estate and, in particular, with regard to distribution of the estate's assets and the funding of the marital bequest.

■■ Applying *Dombrow's* "independent advice" standard to the instant case, we find that Carol had no such counsel. Certainly there is no *clear and convincing evidence* that she was given same, as *Dombrow* requires.

The evidence demonstrates the following facts. At the time of decedent's death, Carol did not have her own lawyer. Nor did she consult with one as to the will and its provisions as they pertained to her. She relied upon her sons to handle the estate. Harold Burnstein, the

estate's lawyer, was primarily involved in the valuation of the estate's assets, a process which was concluded in October 1985. During this valuation process, Carol received no independent advice or counsel or independent information as to the value of the estate's assets.

Walter Dahl, a former Cook County circuit judge, testified for the respondents as an expert in probate matters. He stated that it was customary for lay executors to rely on professional advice and to attempt to minimize taxes and make conservative investments during the pendency of the estate. Dahl conceded that it would have been "almost reckless" for the sons to involve this estate interest in speculative theater ventures without the consent of all three of the co-executors. He further believed that Jerrold and Louis did not improperly delay the funding of the marital bequest; and he viewed those disbursements of assets as "consistent with what you usually expect to happen in this kind of an estate." He also testified that it would be "totally out of keeping" for sons dealing with their mother in the context of total trust to tell her to "run off and get another lawyer." Dahl also stated that it would be unusual for one executor to retain a lawyer to represent solely his interest; however, the issue of receiving and securing independent and competent advice in a situation where the personal interests of the executors may conflict was not addressed.

Of particular significance was the testimony of James M. Trapp, an attorney recognized by the trial court as an expert in estate administration. Testifying on Carol's behalf, Trapp stated that the normal custom and practice in an estate with bequests of this type was that a partial funding of the marital bequest would occur sometime after the statutory claim period expired and that the full funding of the bequest's balance would occur shortly after the Federal estate closing letter issued. Trapp stated that a distribution equalling at least $2 million of the estate's assets could have been quickly distributed after the closing of the claims period in 1984 at the latest.

Further, Trapp testified that, as the distribution was prolonged, the conflict of interest of Jerrold and Louis as the dominant executors grew by reason of their positions as M & R's corporate officers with knowledge of the business' expansion and value. Trapp found it significant that the will contained no conflict of interest waiver, which resulted in the need for Jerrold and Louis to be substantially more circumspect in documenting and revealing their dealings with Carol as to the estate's assets.

Trapp also testified regarding M & R's use of loans from businesses in which the estate had a substantial equity interest, as well as

bank loans based at least in part on the credit of the same businesses. In said transactions, which funded the acquisition of the Fine Arts, Hyde Park and Evanston theaters and the construction of the Webster Place and River Run cinema complexes, Jerrold and Louis together took a 50% ownership interest, and the estate received nothing. Trapp stated that, in this type of circumstance, it was contrary to custom and practice for the dominant executors not to "lay out a very good record [of the proposed transactions] to an interested beneficiary," namely, Carol. Moreover, Trapp opined that Carol either constructively through the estate or individually should have received 28% interest (75% of 35%) in the acquisition and a construction of the five additional movie complexes. Specifically, Trapp stated:

"[I]n the conflict position that [Jerrold and Louis] were in, I would think that the practice would be either that they would offer that similar opportunity to the estate or build a very good paper trail on why it was offered, why it was refused, why it was fair not to put it in the estate but to take it on to just a couple of people."

Further, in his cross-examination, Harold Burnstein testified that his primary task as the estate's lawyer was to negotiate with the IRS about valuation of the estate's assets. He was not consulted by Jerrold or Louis on any other estate matter. Burnstein was never told of the loans from which the estate held an equity interest for the purposes of acquiring or constructing theater complexes. Nor was Burnstein ever told of the fact that M & R's acquisition and construction of the five theater complexes were financed largely by borrowing from companies in which the estate had an equity interest. Burnstein was never given any of the M & R's financial reports by the dominant executors, nor did they give him a list of the estate's receipts or disbursements. Burnstein admitted that the closer a distribution is made to a decedent's death, the less likely it is that problems will arise in the interim. From this testimony, it is obvious that Burnstein, contrary to Jerrold and Louis' assertions, was incapable of rendering Carol any *competent* and independent advice as to the lack of a quick distribution of the marital bequest and the funding of the five theater acquisitions with loans from companies in which the estate held an equity interest. Burnstein did not have the knowledge necessary to provide such advice.

Further material evidence came in the testimony of Jerome Harris, the estate's accountant. He testified that other than assisting in the valuation of the estate's assets for Federal estate tax purposes and preparing the yearly fiduciary income tax returns, he performed

no other substantial tasks for the estate. Contrary to Jerrold and Louis' assertion that Harris was a source of competent, independent advice for Carol, we find little in his testimony that indicates he was particularly knowledgeable of the dominant executors' fiduciary responsibilities. Certainly, Harris made no effort to apprise Carol as to the ramifications of the actions taken by the dominant executors. He never met with Carol alone to discuss estate matters.

Moreover, Jerrold testified that he never asked the estate's lawyer, Burnstein, or its accountant, Harris, about his role as an executor and fiduciary. He also stated that he never asked Burnstein or Harris whether it was a violation of his fiduciary duty to utilize estate assets to acquire properties for his personal gain. In a similar vein, Louis testified that he never gave any thought to making the estate an equity owner in any of the new theaters acquired after decedent's death. Also, Jerrold's and Louis' attempts to portray Carol as a savvy businesswoman who had a great deal of experience in financial matters is not well taken. The record shows that she had little direct experience in financial matters and was, at most, tangentially involved in the M & R businesses.

As to the timing of the distribution of the marital bequest and the propriety of using assets owned, in part, by the estate for acquisition of new properties that would solely benefit the dominant executors, we find that Carol clearly received no competent and independent advice in this regard. Accordingly, as to these two allegations of breach of fiduciary duty, we find that, under the *Dombrow* standard, Jerrold and Louis clearly failed to meet their burden of coming forward with clear and convincing evidence that Carol had independent and competent advice. This is the standard that was not met by Jerrold and Louis, and, by so ruling, we do not hold that Jerrold and Louis actively misled Carol.

As to the manner in which the marital bequest was funded, the testimony of Carol's expert in estate administration, John Trapp, is again pertinent and probative. Trapp testified that the burden was on Jerrold and Louis to show that they had put before Carol all the necessary facts for her to arrive at an informed decision. In addition to this full disclosure, it also had to be demonstrated that Carol had an opportunity to consult with independent counsel. If Carol was not given that opportunity to consult with independent counsel, then the executors should have sought the court's guidance.

Further, Trapp stated that, in his practice as an estate attorney, he advised a spouse, who had a significant share of an estate, that independent counsel might be essential to apprise her of rights to distri-

bution. If Trapp had been asked by the executors as of December 1986 how the marital bequest should be paid, he would have told them to get an accurate appraisal of the estate's assets and then turn to the court for guidance. If over the years since the decedent's death the estate's assets had appreciated significantly, then a strict distribution in cash could have produced an "enormously unfair result." Trapp reiterated that, due to late date of the funding of the marital bequest, it was essential to obtain court approval for the distribution.

Harold Burnstein testified regarding the presence of Lance Rodgers at the March 9, 1987, meeting wherein funding the marital bequest was discussed. Burnstein had an "uncomfortable feeling when one of the executors [Louis] brings in a personal attorney, and it is a situation where I thought we had a friendly family and that there was peace and harmony."

Lance Rodgers testified that he met with Carol once in 1986, at the suggestion of Louis. During this meeting, Rodgers discussed with Carol the possibility of deciding what her financial requirements would be for her lifetime, taking assets which would satisfy those needs, and then giving the balance to her sons. Carol indicated that she was not interested in such a plan.

As to the funding of the marital bequest, we find there is no evidence that Carol received any independent and competent advice. As noted above, the estate's attorney was totally unaware of the appreciation of the estate's assets and could not and did not provide her with competent advice. Rather, the evidence shows that Jerrold and Louis were going outside the estate and its attorney in seeking Lance Rodgers' analysis of the will, as well as his suggestions on funding the marital bequest.

■■■ ■ Again, the *Dombrow* standard has not been met. In the crucial matter of funding the marital bequest, it is readily apparent that Carol was left to fend for herself without independent counsel, armed only with incomplete and unsatisfactory information regarding the valuation of the estate's assets in 1987. Further in light of the delay in the distribution of this estate and because Jerrold and Louis did not meet their burden of proving by clear and convincing evidence that Carol had been given the opportunity to have independent and competent advice, the marital bequest shall be set aside and reassessed, and, further, the "Receipt and Approval of Fund Report of Independent Representative" signed by Carol is set aside. *Dombrow*, 401 Ill. 2d at 332-33.

Accordingly, we affirm the dismissal of count I of plaintiff's complaint. We reverse the trial court's decision on count II and remand this cause to the trial court to proceed as follows:

1. To continue in full force and effect at the discretion of the trial court paragraph 1 of page 1 of the order entered on March 4, 1990, providing that Jerrold and Louis may execute shareholders' elections on behalf of the estate subject to notice to the plaintiff and the court order to afford the plaintiff an opportunity to object thereto.

2. That the trial court appoint an independent accountant to prepare a statement of assets, liabilities, receipts and disbursements of the Raymond J. Marks' estate covering the period from May 11, 1982, to the date the notice of appeal was filed in this cause.

3. That a current inventory of the assets of said estate be prepared, together with the value placed on each of said items by the respondents and the plaintiff.

4. That an inventory of the assets of said estate previously transferred or disbursed be prepared, together with the date thereof and the name of the transferee and the value placed on such asset by the respondents and the plaintiff.

5. With respect to the sale of the M & R theater chain to Loews in September 1988, the respondents are directed to provide a report of the amount of the sales proceeds allocated by Loews to each M & R property purchased and the date of each payment therefor and further a schedule of rental payments paid or to be paid for each item of property purchased.

6. With respect to the sale to Loews of the Fine Arts, Evanston, Hyde Park, Webster Place and River Run theaters, respondents are directed to provide the identity of each person to whom sales proceeds were transferred or assigned from Loews' purchase of those theaters and the amount of such sales proceeds received and the dates thereof.

7. That the respondents provide a report setting forth the income received by the estate from May 11, 1982, to the date of this appeal and the amount distributed and to whom on an annual basis or such other convenient period as determined by said accountant.

8. That the respondents provide an exact sum of cash and the value of other assets paid to Carol as her marital bequest together with the date of each disbursement or assignment of assets.

9. That the trial court ascertain the amount of the gift referred to in paragraph 2 of page 1 of the two-page order dated and entered on March 2, 1990.

10. That the trial court ascertain whether Jerrold and Louis were or are directors or partners in any organizations constituting the M & R theater chain and, if so, whether the estate has or formerly had interests therein and, if so, the extent of the estate's former or present interest in each such organization.

11. That the trial court ascertain the names of the M & R chain affiliates newly acquired or established by means of funds loaned or credit extended on the basis of estate benefits and that as to each such organization, the interest formerly or now owned by Jerrold and/or Louis be determined.

12. That, based upon the resulting determinations, the court direct, supervise and allocate the distribution of the assets and the liabilities of the estate and the probate proceedings in this cause be terminated by a proper final account and report.

Affirmed in part; reversed in part and remanded with directions.

UNVERZAGT and DUNN, JJ., concur.