595 N.E.2d 717 (1992)
231 Ill. App.3d 313
172 Ill.Dec. 356
In re ESTATE OF Raymond J. MARKS, Deceased (Carol Marks Jacobsohn, Petitioner-Appellant and Cross-Appellee, v. Jerrold Marks and Louis Marks, Respondents-Appellees and Cross-Appellants).
No. 2-91-1036.
Appellate Court of Illinois, Second District.
June 30, 1992.
*718 Lee A. Freeman, Sr., and James T. Malysiak, argued, Thaddeus S. Gauza, Freeman, Freeman & Salzman, P.C., Chicago, for Carol Marks Jacobsohn.
Lowell E. Sachnoff, argued, Barry S. Rosen, Joel N. Shapiro, argued, Sachnoff & Weaver, Ltd., Chicago, for Jerrold and Louis Marks.
Harold R. Burnstein, Schwartz & Freeman, Chicago, for Estate of Raymond J. Marks, deceased.
Justice BOWMAN delivered the opinion of the court:
This case represents another chapter in the sad and bitter saga of the Marks family. Petitioner, Carol Marks Jacobsohn (Carol), the widow of Raymond J. Marks (Raymond or decedent), brings to this court for the second time her case against her and Raymond's natural sons, and respondents/cross-appellants in this case, Jerrold and Louis Marks. This appeal, like the first one, revolves around the propriety of the marital bequest received by Carol pursuant to Raymond's will.
The facts underlying the first appeal are set forth well and in detail in In re Estate of Marks (1991), 211 Ill.App.3d 53, 155 Ill. Dec. 731, 569 N.E.2d 1342 (Marks I) and will be only briefly summarized here. Raymond Marks died in May 1982. His will designated Carol, Jerrold, and Louis as co-executors and beneficiaries of his estate. Under the will Carol was to receive a marital bequest "in a pecuniary amount equal to ¾ (three-fourths) the value of my adjusted gross estate as finally determined for federal estate tax purposes." The balance of the estate was to be distributed equally to Louis and Jerrold. The will further provided that property distributed in kind to the marital bequest was to be valued at the date of distribution.
The decedent's estate included stock in 24 closely held corporations. The bulk of these corporations, collectively, constituted the business known as M & R Theaters (M & R). Although M & R, which consisted of a chain of movie theaters, was originally established by Raymond, Raymond's brother, and Martin Rosenfield, Raymond's brother-in-law, Raymond himself was the principal officer and prime mover of the company. Eventually, the Marks and Rosenfield families each held a 50% interest in the various M & R corporations. At the time of his death, Raymond alone held a 35% interest in the theaters and properties owned by M & R.
Prior to their father's death both Louis and Jerrold had worked for M & R for a number of years. When Raymond died the sons essentially took over the management and operation of the business, continuing the practices and techniques they had learned from their father. Between 1983 and 1987 M & R expanded and acquired or established a number of new theaters. The new ventures were funded by loans from those M & R businesses in which the estate held a 35% interest at decedent's death or through the use of the assets of the businesses as security for bank loans. With minimal exceptions, the Marks family's interest in the new theaters was held by Louis and Jerrold. While Carol was generally aware of what was going on in the business, she neither actively participated in its management or operation nor received financial data from it.
*719 The IRS valuation of Raymond's estate, which was necessary in order to determine the amount of Carol's marital bequest, was not received until October 1985. During 1986, while the estate attorney gathered information and made preparations for distribution of the marital bequest, the principals of M & R decided to sell the business. Although no acceptable buyers were found, developments in the industry in 1986 and 1987 had the effect of increasing the value of the company.
Early in 1987, for the first time, Carol, Louis, and Jerrold all realized that the marital bequest was based on a specific dollar amount. Prior to that time they were of the impression that Carol was to receive 75% of all the assets in the estate. In September 1987 Carol acknowledged receipt of her bequest in the form of cash.
In mid-1988 the Loews Theater chain bought M & R. Jerrold and Louis each received approximately $20 million, which included payment for a noncompetition agreement. Carol, who had held stock personally in M & R prior to Raymond's death, received approximately $5 million. Louis and Jerrold continued to work for M & R, receiving their salaries from Loews.
In April 1989 Carol successfully moved the court for an order protecting her interest in the estate. The following August she filed a complaint against her sons, alleging, among other things, that Louis and Jerrold, as dominant executors of Raymond's will, had violated their fiduciary duties to her. Carol asserted that her sons had manipulated both the timing and the substance of the distribution of estate assets to her marital bequest, to her detriment and their benefit, and had improperly used estate assets for personal gain. She again asked for court protection of her interest in the estate assets. Following a bench trial, the court denied Carol the relief she requested, holding essentially that Jerrold and Louis had not violated their fiduciary duties. Carol appealed.
In our prior opinion (Marks I) we found that, as dominant executors, Louis and Jerrold had a fiduciary relationship with Carol. Because of this relationship the transactions involving estate assets by which Louis and Jerrold, but not Carol, had profited, were presumptively fraudulent. The presumption could be rebutted by clear and convincing proof that Carol had competent and independent advice before she consented to or acquiesced in the transactions. Louis and Jerrold, however, were not able to produce such proof with regard to the timing of the distribution of assets, the method of funding the marital bequest, or the use of estate assets for acquisition of new properties for their own benefit. Absent rebuttal of the presumption, we held that the marital bequest had to be set aside and reassessed.
We remanded the case to the trial court with 12 specific directions. For the most part the directions pertained to the preparation of various accountings, inventories, statements of assets and liabilities, and statements of receipts and distributions of income of the estate; the gathering of information on the extent of the estate's present or former interest in the M & R Theater chain and the sale of M & R to Loews; and the determination of Louis' and Jerrold's interest in the M & R properties acquired through the use of estate assets. The concluding direction stated "[t]hat, based upon the resulting determinations, the court direct, supervise and allocate the distribution of the assets and the liabilities of the estate and the probate proceedings in this cause be terminated by a proper final account and report." Marks, 211 Ill.App.3d at 70, 155 Ill.Dec. 731, 569 N.E.2d 1342.
On remand, the court's appointed independent accountant, Arthur Andersen & Company, along with the parties, provided information in compliance with our directions. The parties also submitted briefs regarding reassessment of the marital bequest and allocation of estate assets and liabilities in light of our rulings. Finally, the court heard oral argument from the parties on the issue of reassessment of the marital bequest.
The trial judge, Judge Santi, interpreted Marks I as calling for a constructive and equitable redistribution of estate assets in *720 order to rectify the presumptively unfair distribution Carol had previously received. In accord with the perceived directive, Judge Santi noted that Raymond's will called for a marital bequest in the specific pecuniary amount of $2,823,269; He then determined that the constructive date of distribution of the bequest should be December 31, 1986, and that the constructive distribution should consist of both cash and in-kind assets, subject to the pecuniary amount formula set forth in the will. Specifically, the judge found that half of the bequest should be paid in cash and half in the form of a uniform percentage, or "slice," of each noncash asset which existed in the estate as of December 31, 1986. Thus, Carol was to be credited with $1,411,634.50 to be paid in cash and another $1,411,634.50 to be paid in the form of noncash assets. Calculation of the uniform percentage of the noncash assets was directed by the court as follows:
"In order to determine the percentage of each non-cash asset to be transferred to Carol, Arthur Andersen and Company will determine the fraction, the numerator or which is to be $1,411,634.50 and the denominator of which is to be the total value of all in-kind non-cash assets in the Estate as of December 31, 1986 * * *."
The resulting fraction of each noncash asset was then to be distributed to Carol out of the estate. In addition, Carol was to return to the estate one-half of the prior, all-cash bequest she had received. That amount was in return for the noncash assets to be distributed to her. The money was to be repaid with interest, and the cash adjustment necessary for compliance with the order was to take into account a gift Carol had made to Louis and Jerrold in the amount of $574,358. The gift had originally been deducted from the all-cash bequest payment originally made to Carol.
Arthur Andersen & Company was directed to determine the value of the assets in the estate as of December 31, 1986, and to include in the assets the theaters which were acquired or newly established by means of loans or credit from the estate and which were in existence as of December 31, 1986. The theaters were to be valued to the full extent of the Marks family's interest in them. That is, Louis and Jerrold's personal interests in the theaters (along with Carol's minor interest in one of them) were to be disgorged into the estate, and Carol would receive the same uniform percentage of those interests that she received in all the other noncash assets of the estate. The court specifically excluded from the assets to be valued those theaters acquired after the distribution date of December 31, 1986.
Carol was also awarded additional sums necessary to provide her with the benefits of ownership, including income and interest, as if she had received the in-kind assets on December 31, 1986. She was not entitled to any portion of salary compensation paid by Loews to Jerrold or Louis or to the payment made by Loews to Jerrold and Louis personally for their agreement not to compete.
At the conclusion of the parties' arguments and the recitation of the court's findings and conclusions, Judge Santi made a Rule 304(a) (134 Ill.2d R. 304(a)) finding that there was no just reason to delay appeal of his order. He also stayed the completion of the calculations necessary to proceed with the distribution of estate assets, pending the outcome of appeal.
Carol asserts on appeal, as do Jerrold and Louis on cross-appeal, that the trial court misinterpreted our rulings in Marks I with regard to the reassessment of the marital bequest. Both parties attack the date set for constructive distribution, the method used to fund the constructive distribution, and the court's treatment of the various theater interests acquired after Raymond's death. Carol further asserts that the trial court erred in finding that she made a gift to Louis and Jerrold and in requiring her to pay interest on the cash she was required to return to the estate. Carol urges this court to directly order the proper constructive distribution.
Before we begin our discussion of the issues raised by the parties, we find it necessary to make a number of observations. *721 The first matter is technical in nature and has to do with the parties' use of footnotes in their appellate briefs. Supreme Court Rule 341(a) (134 Ill.2d R. 341(a)) states unequivocally that the appellant's and appellee's briefs, unless otherwise authorized, shall be limited to 75 pages and reply briefs to 27 pages. The rule further states that "[n]either narrow margins nor any other device shall be employed to evade the page limitation. Footnotes, if any, shall be used sparingly." 134 Ill.2d R. 341(a).
Appellant's brief in this matter consists of 39 pages and 12 footnotes. Appellees' brief is 72 pages long and contains a total of 61 footnotes. Appellant's reply brief, which is 24 pages in length, includes 9 footnotes, and appellees' 27-page reply brief includes 27 footnotes. This is a total of 109 footnotes, 88 of them attributable to appellees alone! We note also that in appellees' brief in particular, the footnotes sometimes take up as much as one-third to one-half of the space on a page. This is not what we would characterize as the "sparing" use of footnotes. Neither party moved to file a brief in excess of the rule's limitations, perhaps because such "[m]otions to allow additional pages are not favored" (134 Ill.2d R. 341(a)). However, the "footnote" approach to getting around the page limitations is a violation of the spirit, and probably of the letter, of the law and is not favored, either.
The second item we address pertains to procedure. In the course of explaining in her reply brief why she did not provide for deduction of debt repayment and related expenses incurred in the sale of the theaters to Loews, petitioner refers to certain balance sheets provided to her by respondents. The balance sheets and accompanying letter are attached to petitioner's reply brief, and petitioner's discussion appears to revolve around the balance sheets. However, as far as we can discern, and as respondents claim, the letter and documents were never presented to the trial court, are not part of the record on appeal, and, therefore, are not properly before us. Accordingly, on the court's own motion, the letter and balance sheets attached to petitioner's reply brief and labeled "Exhibit C" are stricken and will not be considered further.
With our procedural concerns out of the way, we turn our attention to the substantive issues. Both parties disagree with the way the trial court interpreted Marks I. As we discussed above, the lower court concluded that we had determined the original bequest to be presumptively unfair and, therefore, had remanded so the trial court could devise an equitable way to reassess and determine the bequest and then make sure the estate assets were distributed accordingly.
Carol contends that after Marks I there was nothing left to reassess, that our prior opinion told the lower court everything it needed to know and do. She argues that the trial court simply should have followed our directions rather than embark on an independent reassessment of the bequest. Carol strenuously objects that the court wholly lacked the discretion to make such a reassessment.
Louis and Jerrold, on the other hand, challenge the trial court's conclusion that in Marks I we conclusively determined that the original marital bequest distribution was not fair to Carol. They posit that our rulings were based on a finding, not that the marital bequest transaction was actually, substantially unfair, but that they had not carried their burden of showing by clear and convincing evidence that Carol had received competent independent advice. They argue that the bequest distribution could have been fair despite the lack of such advice to Carol. Respondent's maintain that the trial court, rather than starting with a presumption of unfairness, should have determined whether Carol was treated fairly even though she did not have proper advice. We do not entirely agree with either of the parties.
In Marks I we relied on Dombrow v. Dombrow (1948), 401 Ill. 324, 82 N.E.2d 47, where the court said that, when there is a fiduciary relationship between the parties, and only the dominant party profits from a transaction between the parties, the law *722 presumes the transaction was fraudulent. While the presumption is rebuttable, if it is not rebutted, the transaction will be set aside in equity. We found that Louis and Jerrold had not carried the burden necessary to rebut the presumption. In other words, respondents had not been able to adequately show that their relevant dealings with Carol were fair to her. Consequently, the presumption that Carol had been treated unfairly remained intact. That is why we set aside Carol's marital bequest.
Louis and Jerrold's position misapprehends our decision in Marks I. What respondents seek is to show that, even without independent advice to Carol, the transactions were fair. We have already determined, however, that, absent objective advice, the transactions will be presumed unfair. Louis and Jerrold seek a second opportunity to overturn the presumption. This is something to which they are not entitled.
With regard to Carol's argument, we disagree that the trial court lacked discretionary powers. Carol reads more into Marks I than we placed there. In the prior case we found that the relevant transactions were presumed to be unfair, and, while we did not expressly state it, we clearly inferred that Louis and Jerrold, therefore, had breached their fiduciary duties to Carol. The inequity in the funding and timing of the marital bequest, and the respondents' use of estate assets for personal gain, required that the bequest be set aside. For the most part, our focus in Marks I was on the lack of fairness to Carol. Our final conclusion was that the entire matter of the marital bequest had to be done again, this time assuring that Carol was treated fairly.
In our directions we instructed the trial court to appoint an independent accountant to prepare pertinent information on the estate itself and to make a number of specific determinations which would be relevant to the amount and content of the bequest to be made to Carol. We also directed the parties to prepare and provide specific information regarding the income and past and present assets of the estate, as well as the distributions previously made to Carol as her marital bequest. We concluded with a directive to the trial court that "based upon the resulting determinations," it should "direct, supervise, and allocate" the distribution of the estate assets and liabilities. (Marks, 211 Ill.App.3d at 70, 155 Ill. Dec. 731, 569 N.E.2d 1342.) Through this language we placed the nuts and bolts of the task of fashioning an equitable marital bequest squarely on the trial court.
In the body of our Marks I opinion we established that the goal was to reach a fair and equitable result. We also attempted to provide guidelines for the trial court to follow in pursuit of that goal. Through the directions we tried to assure that the trial court would have the tools, in the form of information, that it needed to progress toward a proper disposition. That is where we stopped. We did not ascertain the specifics of the bequest. Rather, at that point, we placed the entire matter in the capable hands of the trial court. Since the remedy to be achieved was equitable in nature, we fully expected the lower court would exercise its discretion where necessary, keeping in mind all that we had said in Marks I.
Contrary to Carol's insistence otherwise, we did not determine that the distribution should be made as of a time shortly after October 1985, which is when the IRS estate tax liability letter was received. It is true that we discussed the testimony of James Trapp, Carol's expert witness, in relation to the timing of the distribution and that the overall thrust of our discussion was that things might have been done differently if Carol had had the independent counsel she should have had. Nowhere, however, did we find conclusively that, in order to be fair, the distribution to the marital bequest had to constructively occur shortly after receipt of the IRS letter. Nor did we determine, as Carol also insists, that the distribution had to be all in kind. While we made clear that the theater stock, as an estate asset, had to be considered in reassessing the marital bequest, at no point did we find that fairness demanded a total, in-kind distribution. In this regard we note that section 5.02(g) of the decedent's will *723 expressly authorized the executors to distribute the estate "in cash or in kind or both." There is no basis for Carol's claim that, under Marks I, the bequest had to be totally in kind.
Having decided that the trial court was expected to exercise its discretion on remand after Marks I, we next address the various ways in which the parties claim the lower court abused its discretion. A decision left to the discretion of the trial court will be disturbed on review only if there has been an abuse of discretion. (In re Estate of Wiese (1989), 178 Ill.App.3d 938, 942, 128 Ill.Dec. 95, 533 N.E.2d 1183.) In determining if the trial court has abused its discretion, the question is whether the court acted arbitrarily without the use of conscientious judgment, or exceeded the bounds of reason and ignored established principles of law so that substantial injustice resulted. (In re Marriage of Lee (1979), 78 Ill.App.3d 1123, 1127, 34 Ill.Dec. 451, 398 N.E.2d 126.) In other words, discretion is abused where no reasonable man would take the view adopted by the trial court. In re Marriage of Getautas (1989), 189 Ill.App.3d 148, 153, 136 Ill.Dec. 509, 544 N.E.2d 1284; Lee, 78 Ill.App.3d at 1127, 34 Ill.Dec. 451, 398 N.E.2d 126.
Before we resolve the "abuse of discretion" questions, we must comment on a matter which, although no longer really an issue, is raised by Carol and vehemently challenged by Louis and Jerrold. Throughout her brief Carol repeatedly, over and over again, states, implies, and infers that Louis and Jerrold acted in bad faith. The record reveals that the trial court expressly found to the contrary. In Marks I we set forth examples to show that Jerrold and Louis "did not realize or understand their duties in the position they occupied" (Marks, 211 Ill.App.3d at 63, 155 Ill.Dec. 731, 569 N.E.2d 1342). Further, we expressly stated that, by ruling that respondent's had not met their burden of proof, "we do not hold that Jerrold and Louis actively misled Carol." (Marks, 211 Ill. App.3d at 67, 155 Ill.Dec. 731, 569 N.E.2d 1342.) We believe this issue has been considered and resolved. Neither we nor the trial court could discern in the record a basis for finding any intentional wrongdoing by Louis or Jerrold. Our present review has not changed that perception. Hence, despite Carol's dogged persistence in returning to the subject, we decline to consider it again.
Returning now to the issues, both parties complain of the date selected by Judge Santi for the constructive distribution. Carol wants it set earlier on the ground that, had she received the bequest in the form of theater stock in a timely fashion, she would have enjoyed the benefit of appreciation in the stocks' value, as did Louis and Jerrold. She urges that the correct time would have been shortly after receipt of the IRS estate closing letter in October 1985. Louis and Jerrold prefer that the constructive date be the same as the actual distribution date of August 5, 1987. The trial judge rejected the suggestions of both parties and chose what we agree is a reasonable date.
First of all, there is no evidence that Louis and Jerrold deliberately delayed the distribution date after the IRS letter was received. What the evidence does show is that the estate was not ready for distribution before the end of 1986. The estate attorney worked throughout 1986, and even into early 1987, to prepare for distribution. Correspondence in the record reflects Jerrold's full and prompt cooperation with the attorney in this process.
Further, according to the record, it was only at the end of 1986 that any of the beneficiariesLouis, Jerrold, or Carolbecame aware that the bequest was a pecuniary amount rather than a fractional amount of all the estate assets. Thus, it was only then that they could have realized that the bequest could be all cash, as opposed to a portion of all the assets, whether in-kind or cash. It is noteworthy, with regard to Louis and Jerrold's intentions, that they did call a meeting shortly after learning of the pecuniary nature of the bequest, on March 9, 1987, to discuss funding the bequest. Nevertheless, as Judge Santi observed, there is no doubt that *724 Louis, and particularly Jerrold, were more knowledgeable about business in general, and the family business in particular, than was Carol. Consequently, they were well aware of the ongoing financial status of the assets in the estate and the meaning of the requirement in Raymond's will that in-kind assets distributed to fulfill the marital bequest were to be valued as of the date of distribution. This knowledge enabled respondents to grasp the significance of the various methods of funding the marital bequest and to understand the consequences of further delay of the distribution. In light of their awareness of all these factors, Louis and Jerrold should have funded the bequest as soon as they learned of the nature of the marital bequest, in December 1986.
The trial court also heard evidence from James Trapp, Carol's expert witness, on the matter of timing. Although Trapp's testimony indicated that he thought Carol's bequest should have been funded, for the most part, earlier than the end of 1986, he testified on cross-examination that there is no exact time for distribution of an estate's assets, that it depended on all the facts. He also admitted that he could think of facts and circumstances in which 12 months after receipt of an IRS closing letter would not be too long to delay distribution.
In summary, in light of all the evidence presented at trial, we do not believe the trial court abused its discretion by choosing December 31, 1986, as the date for constructive distribution. We cannot say that no reasonable person would have chosen that date.
Both parties next contend that the trial court also abused its discretion by funding the marital bequest with 50% cash and 50% in-kind assets. Carol asserts that the entire constructive bequest should consist of in-kind assets. She urges that at the time the distribution should have taken place (according to Carol, shortly after October 1985) the IRS valuations were still equal to current market values and, therefore, she would have received 75% of the assets. Since the bulk of the assets were in the form of theater stocks, she would have received all stock. Louis and Jerrold, on the other hand, maintain that an all-cash distribution was appropriate because it was consistent with the needs, interests, and financial objectives expressed by Carol at the time and reflective of the advice she actually received. Once again, we agree with the trial court.
To begin with, we have already decided that Judge Santi exercised proper discretion in selecting a distribution date of December 31, 1986. What the IRS valuation would be, compared to market values at that time, we cannot tell. However, even if they were the same, Carol would still not necessarily be entitled to a 100% in-kind distribution. Her position ignores the provision in the will whereby the bequest could be funded with cash, in-kind assets, or a combination of the two. Obviously, there was no way for the trial court to know for sure which kind of funding Carol would have chosen if she had had objective advisors in December 1986. Hence, pursuant to Marks I, the court had to devise an equitable method of funding Carol's bequest.
Carol argues that the trial court simply adopted the distribution method suggested by Louis and Jerrold. While it is true that, in their trial brief on remand, respondents proposed the "slice" method of distributing in-kind assets to Carol, Judge Santi made abundantly clear that he had reached his determination, independently, before receiving respondent's brief. Carol further argues that, in any event, the distribution chosen by the trial court is arbitrary and based on improper considerations. In rendering his decision, Judge Santi emphasized our statements in Marks I that we had not found Louis and Jerrold's conduct to have been willful. The judge then indicated that he sought a result which would be fair and equitable to all the parties. It is clear from his further comments that, in order to achieve such a result, Judge Santi attempted to balance the equitable considerations favoring Carol, as expressed in Marks I, against the equitable considerations favoring Louis and Jerrold, as revealed by the trial evidence.
The evidence showed that Carol, who was wealthy in her own right, had established *725 a pattern of preferring conservative investments in her own financial affairs. She invested primarily in high-grade, lowrisk vehicles, such as treasury bills, fixed income bonds, and tax-free municipal bonds, or in highly liquid investments such as money market funds. Although it was offered to her, Carol declined to invest in the equity in most of the new, and riskier, ventures of M & R. Also, the record reflects that estate planning was important to Carol in order to maintain the wealth her husband had accumulated for the benefit of her children and grandchildren. Similarly, Carol seemed to want Louis and Jerrold to take over ownership of the business. For example, she continued her husband's practice of giving Louis and Jerrold gifts of shares of her personal M & R stock. And, although she received ample income from the M & R stock she owned personally, as we mentioned, she did not want stock in the new theaters. In fact, Louis testified that she offered to loan money to himself and Jerrold if they needed it in order to make a capital contribution for some of the new theaters. Carol expressed that, since she was not participating in running the business, she did not wish to take a share of the theaters herself. As for the running of the business, the evidence is clear that it was Louis and Jerrold who managed it and operated it. For the most part they continued the policies and procedures begun by their father. It was they who expanded it and made it successful or withstood its failures. Carol was not actively involved with any aspect of the business.
Collectively, the evidence seems to show that in December 1986 Carol almost certainly would have taken a significant portion of her bequest in cash, no matter what advice she received. On the other hand, despite Louis' and Jerrold's contrary opinions, an independent advisor, knowledgeable about the stocks in the estate and the businesses represented by those stocks, might well have been influential in persuading her that at least part of her bequest should be taken in kind. If she were so persuaded, it is unlikely, judging from the evidence, that she would have taken more than half of what was due in the form of stock, first, because of her general reluctance to invest in higher risk equity investments and, second, because of her inclination to shift the business into Louis' and Jerrold's hands.
Added to the evidence of what Carol would have done under ideal circumstances is the evidence that Louis and Jerrold devoted themselves to the family business, contributing greatly to its success and increased value. Finally, the conclusion that Louis and Jerrold did nothing to willfully or deliberately take advantage of their mother for their own benefit must be taken into consideration. They failed to act on their duties out of ignorance, not a malicious spirit.
In the light of all that was known to the trial judge, we conclude that he exercised his discretion wisely. His decision reflects a realistic view of what was fair to Carol. Louis and Jerrold meant their mother no harm when they urged her to take a cash bequest. Nevertheless, she now will constructively have half of that bequest in theater stock, stock which accrued in value in great part due to the efforts of her sons. To have given Carol more than she likely would have taken herself would have been unfair and in the nature of a punishment to Louis and Jerrold. They would thus have been deprived of something for which they worked very hard and most likely would have had except for an honest mistake. Equity is about fairness, not punishment. Under the trial court's solution, Carol will get what she probably would have sought in the first place and Louis and Jerrold will have to give up that same amount to Carol to make up for their error. The court needed to go no further to achieve an equitable result. Once again, we cannot say that no reasonable man would take the view adopted by the trial court.
Both parties challenge the trial court's rulings on the next issue we address. After Raymond died, but before December 31, 1986, M & R acquired the Fine Arts, Hyde Park, and Evanston theaters. After December 1986 the company built the Webster Place and River Run theaters. These are the theaters that were financed in part with loans from, or credit secured by the assets of, the M & R businesses in which *726 the estate held a 35% interest. Jerrold and Louis, personally, held all of the Marks family's interest in all of the new theaters, except for a 10% interest Carol took personally in the Fine Arts. No equity in the theaters was offered to the estate. Judge Santi ordered that 100% of the Marks family's interests in the theaters acquired before December 31, 1986, should be disgorged into the estate and calculated into Carol's marital distribution along with all the other noncash assets. The theaters built after the constructive distribution date were not included in the order.
Carol insists that the respondents' interests in all of the theaters should have been deemed to be part of the estate since the M & R companies helped acquire all of them. Louis and Jerrold counter that none of their interest in the five theaters should be included in the estate because they did nothing so wrong as to warrant such a drastic remedy. They characterize Judge Santi's order as unfair to them and a windfall to Carol. Alternatively, Louis and Jerrold contend that, if disgorgement is required, it should be measured by the estate's imputed contribution to funding the new theaters.
The matter of the two theaters acquired after December 31, 1986, is easily resolved. We have affirmed that December 31, 1986, is to be the date for constructive distribution of the marital bequest. Once Carol has received her bequest in full, there remains only the residual estate which was left to Louis and Jerrold. Thus, from December 31, 1986, forward, Louis and Jerrold are the only beneficiaries of Raymond's will, and what they do with the residual estate assets is of no concern to Carol. She is not entitled to any interest in the theaters acquired after she received her bequest.
As for the remaining theaters, Louis and Jerrold did benefit from intercompany lending in that they acquired ownership in the new theaters. It is also true that respondents did not offer similar benefits to the estate. However, they did not directly use estate assets in the relevant business transactions. The assets used were those of the old M & R theater companies. The estate had an interest in the transactions only in its capacity as a shareholder in those M & R companies. This connection is far more tenuous than the usual situation where the fiduciary, for his own benefit, takes or uses the assets actually belonging to the estate or trust. See In re Estate of Swiecicki (1985), 106 Ill.2d 111, 118-19, 87 Ill.Dec. 511, 477 N.E.2d 488.
Moreover, the evidence indicates that Louis and Jerrold's failure to offer to the estate the opportunity for ownership in the new theaters was totally unintentional. Louis testified that it never occurred to him that such an offer should be made. This lack of concern is understandable in light of the fact that Louis and Jerrold were essentially continuing a practice begun by their father. They viewed the intercompany transactions strictly as business, a practice which facilitated expansion and, in turn, benefited the old companies as well. Also, as each new theater opportunity came along, Louis and Jerrold offered Carol an equity interest. With the exception of the Fine Arts theater, Carol declined the offers. Hence, Louis and Jerrold had no reason to think the estate should also be offered an equity interest.
Louis and Jerrold were not benefiting at the expense of the estate. In fact, ultimately they were probably helping the estate. The breach of duty which occurred here was not deliberate and not done out of an attitude of self profit. And it was not blatant or egregious. The estate itself was remote from respondent's conduct and affected only indirectly. Under these circumstances we believe it would be unfair to demand that Louis and Jerrold return their entire interest in the three pertinent theaters to the estate. The result of such a demand would be an unwarranted windfall to Carol. We agree with Louis and Jerrold that it is necessary to return only the interest equal to the estate's imputed participation in the financing of each new theater. Upon remand the trial court will determine a method for calculating the precise extent of that interest.
Carol next challenges the trial court's findings regarding a gift from her to Louis and Jerrold. The court originally found that Carol had made a gift to her sons of *727 the balance of the marital bequest remaining after she had received a payment on it. Because the court did not determine the amount of the gift, in Marks I we directed it to do so. The trial court then found that the gift was in the amount of $574,358. Carol now posits that we set aside the gift when we set aside the marital bequest and that the trial court erred in restoring it on remand. Carol's position is not well-founded.
Our direction in Marks I is "[t]hat the trial court ascertain the amount of the gift referred to" in the court's earlier order. (Marks, 211 Ill.App.3d at 70, 155 Ill.Dec. 731, 569 N.E.2d 1342.) This was not a setting aside of the gift. On the contrary, it was an affirmance of the court's finding that a gift had been made and a charge to find out the amount of the gift. This information was then properly used by the trial court to help determine a fair marital bequest for Carol.
With regard to Carol's complaint that she should not have to pay interest on the cash she is required to return to the estate, we can see no justification for her position. Carol will receive her constructive distribution half in cash, half in-kind as of December 31, 1986. The in-kind assets will replace the cash she must return to the estate. Since Carol will also receive interest, income, and any other benefits of ownership of the constructive distribution from December 31, 1986, forward, the interest she has been earning on the cash she originally received must also be returned. To award her all the income and interest benefits of the constructive distribution, and allow her to keep the interest from the actual distribution also, would be an unwarranted windfall. The trial court was correct in requiring her to pay interest on the money to be returned to the estate.
The final point we must discuss is Carol's suggestions as to how this matter should be handled on remand. Apparently unhappy with Judge Santi's resolution of the parties' dispute, Carol first urges that this court "should itself fashion a full remedy" for her. Alternatively, she urges that, for purposes of supervision and administration of the distribution and closing of the estate, the case should be remanded to a different circuit judge. This request is baseless.
Carol attacks the trial court, not so much on the basis that it demonstrated prejudice directly against her, but that the probate judge expressed prejudice by his "willful disregard" of this court's rulings in Marks I. She claims that the trial court "ignored" the law, "evaded" and attempted to achieve a "backhand reversal of" Marks I, "disparaged" and "in no instance sought to comply" with our directions. Moreover, according to Carol, the probate court appeared "prejudicially determined to relieve Louis and Jerrold of liability," and the entire point of the 50/50 split employed by the trial court was "to enable Jerrold and Louis to retain * * * tainted profits." These emotion-charged assaults on the trial court are not an accurate reflection of the record and are not well taken.
We have reviewed, from beginning to end, the report of proceedings of this case on remand. What they reflect is a diligent effort by the trial judge to interpret and apply our rulings in Marks I, to explain the rationale for each of his own conclusions, and to be thorough in executing the directions we previously set forth. They also demonstrate a decidedly conscientious endeavor to reach an appropriate and equitable resolution for all the parties to this prolonged and divisive conflict. Carol's attempt to portray the lower court's efforts as a flaunting of our authority or an expression of bias in favor of Louis and Jerrold is without foundation and is marked by the twisting and distortion of the record.
It is one thing to challenge a trial judge on the basis of error or abuse of discretion. It is altogether something else to launch a tiresome tirade against him on the basis of prejudice which is not substantiated by the record. We see no reason to take it upon ourselves to fashion Carol's remedy. Nor is there a reason to remand the matter to a different circuit court judge.
For all of the reasons set forth above, the judgment of the circuit court of Lake County is affirmed except as to that portion which held that 100% of the Marks family's interest in the Fine Arts, Hyde Park, and Evanston theaters must be *728 deemed to be in the estate. That portion of the judgment is modified to hold that the Marks family's interest in the named theaters is deemed to be in the estate only to the extent of the estate's, imputed, pro rata participation in the financing of the new theaters. The trial court is directed to determine and execute a method of calculating the percentage of estate participation. That amount of the Marks family's interest will then be included in the assets of the estate and be subject to the computation of Carol's marital distribution, the same as the other noncash assets. The trial court is also directed to proceed with preparation of the information called for in the directions given in Marks I and to utilize that information to distribute the assets of the estate in conformity with Marks I and this opinion.
Affirmed as modified and remanded with directions.
GEIGER and DUNN, JJ., concur.